John Forrest Parker was convicted in the Circuit Court of Colbert County of capital murder and was sentenced to death. In a unanimous decision, the Court of Criminal Appeals affirmed Parker's conviction and sentence. See Parker v. State,587 So.2d 1072 (Ala.Crim.App. 1991), for a detailed statement of the case and the pertinent facts. On certiorari review, we affirm.
The Court of Criminal Appeals correctly resolved the numerous issues discussed in its opinion. We find it necessary to discuss only one of those issues — whether it was plain error for the prosecutors to personally vouch for the credibility of two of the state's primary witnesses.
Ronnie May, who was an investigator with the Colbert County Sheriff's Department and who had been the chief investigator in this case, sat with the prosecutors during the trial and helped them present the state's case. May also served as a witness for the state; he testified that Parker made to him a detailed statement relating the circumstances surrounding his activities at the Sennett residence on the day of the murder. May further testified as to the content of that statement. Because Parker had refused to give a signed statement or to allow May to tape record his statement, May had prepared notes after his interview with Parker, and he used those notes at trial to refresh his memory. Therefore, whether May's rendition of Parker's statement was credible was an important issue that had to be resolved by the jury. Parker contends that plain error occurred when the chief deputy district attorney, Mr. Hudson, made the following closing argument during the guilt phase of the trial:
 "What do we have that would go toward tying John Parker to this crime? Of course, the most obvious thing we've got is his statement. We got a confession from him. And I know good and well that you don't think that that statement *Page 1183 
came any other way but . . . the way Mr. May said it did. I've known Ronnie May for a long time and worked with him for a long time and, of course, when we put a witness on the witness stand we vouch for [his] credibility just as the defense does when they call a witness. But I can assure [you] right now that what Ronnie May testified to you about — about anything, but particularly about the statement that I'm talking about right now that was given to him on March the 31st by Mr. Parker. I can assure you he told you the truth, what was told him by Mr. Parker. And I don't for any one minute think that any of y'all think he would get up and make it up or fabricate it or anything like that. But I can assure you, ladies and gentlemen, what he told you is the truth with regard to that statement."
Parker further contends that plain error occurred when the district attorney, Mr. Alverson, made the following closing argument in rebuttal during the guilt phase of the trial:
 "There is no such thing as a case that you couldn't look at long enough and hard enough and find some kind of little inconsistency in the testimony and the reason for that is, I submit to you at least from the state's witnesses they were trying very hard to tell you the truth and the truth as they saw it. Like Mr. Hudson said, we vouch for the credibility of those witnesses by putting them on the stand and I submit to you that they've told the truth. . . ."
As the Court of Criminal Appeals correctly recognized in its opinion, 610 So.2d 1171, the prosecutors' remarks were an improper attempt to bolster May's testimony by personally vouching for his credibility. Remarks such as these have been soundly condemned. See, e.g., Adams v. State, 280 Ala. 678,198 So.2d 255 (1967); Arthur v. State, 575 So.2d 1165
(Ala.Crim.App. 1990), cert. denied, 575 So.2d 1191 (Ala. 1991); King v.State, 518 So.2d 191 (Ala.Crim.App. 1987); Moseley v. State,448 So.2d 450 (Ala.Crim.App. 1984); McGhee v. State,41 Ala. App. 669, 149 So.2d 1 (1962), aff'd, 274 Ala. 373,149 So.2d 5 (1963). In United States v. Young, 470 U.S. 1, 18-19,105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985), the United States Supreme Court succinctly stated the dangers inherent in a prosecutor's vouching for the credibility of the prosecution's witnesses:
 "The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence. See Berger v. United States, 295 U.S. [78], at 88-89, 55 S.Ct. [629], at 633 [79 L.Ed. 1314, 1935]."
However, the Court of Criminal Appeals also correctly recognized that whether the prosecutors' remarks constituted plain error depended on whether those remarks, when viewed in the context of the entire closing argument and in the context of the entire trial, undermined the fundamental fairness of the trial and, thus, constituted a miscarriage of justice. SeeEx parte Smith, 581 So.2d 531, 532 (Ala. 1991) (" '[p]lain error' exists when the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the proceedings . . .; in other words, 'plain error' exists when a substantial right of the defendant has or probably has been adversely affected"). In United States v. Young, supra,470 U.S. at 11, 12, 16, 105 S.Ct. at 1044, 1045, 1047 the Court noted:
 "Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. Instead, . . . the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must *Page 1184 
consider the probable effect the prosecutor's [remark] would have on the jury's ability to judge the evidence fairly. . . .
". . . .
 "Especially when addressing [a claim of] plain error, a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record. We have been reminded:
 " 'In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution.' Johnson v. United States, 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring).
 "It is simply not possible for an appellate court to assess the seriousness of the claimed error by any other means. As the Court stated in United States v. Socony-Vacuum Oil Co., 310 U.S. [150], at 240, 60 S.Ct. [811], at 852 [84 L.Ed. 1129 1940], 'each case necessarily turns on its own facts.' "
Considering these principles, we cannot say that the prosecutors' remarks rose to the level of plain error. Viewed in context, these remarks, although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial. This conclusion is based on our exhaustive review of the record, particularly the prosecutors' remarks during closing argument; May's testimony; Parker's statements and arguments that showed his theory of the case; and the trial court's oral charge to the jury.
Parker's theory of the case was essentially that Charles Sennett had hired Parker and Kenneth Smith to assault and threaten Sennett's wife, but not to kill her; that Parker and Smith had, in fact, gone to the Sennett residence on the day of the murder and had assaulted Mrs. Sennett; that the injuries received by Mrs. Sennett during the assault, although severe, were not necessarily life threatening; that Charles Sennett had come home shortly after the assault and killed his wife; and that Charles Sennett had committed suicide once he became a suspect in the case.
May testified on direct examination, in pertinent part, as follows:
 "Q. If you would — if you have to refer to that to refresh your recollection, do so, but if you would, tell us what you recall him saying to you on that occasion.
 "A. Initially Mr. Parker told me that on March the 18th, 1988, that Billy Gray Williams and Kenneth Smith had used his car to go to the Sennett home to kill Mrs. Sennett. He said he had been given $1,000 cash money to allow them to do that, to use his car. During this portion of the conversation I asked him if he had — was using any kind of drugs and he said he was not that day, on the 31st is when we're talking about. I asked him if he was a drug addict and he said he was, but that he had not used any narcotics on the 31st. I asked him if he was telling me the truth about Mr. Smith and Mr. Williams using his car and he stated that at that time he was. I told him I didn't believe him and he said, 'Okay. I'll tell you the truth.' And he told me that on March the 18th, 1988, that somewhere in the early morning around 9:30 or that proximity, he and Kenneth Smith drove to Mrs. Sennett's home, which is located on Coon Dog Cemetery Road. That they went in his car, a 1978 Pontiac. He stated that on the way down that he shot up 3 cc's of Talwin and that the only weapon they had with them was a survival knife. Mr. Parker stated he drove the car and Kenneth rode in the passenger's side. That he gave Kenny the knife on the way to the house and that Kenny sharpened the knife all the way down there. He stated they went to the driveway, pulled to the rear of the house near the little patio and rear door and that they got out and went to the door. He said he couldn't explain why when Mrs. Sennett came to the door that they didn't jump her then. He just said he knows it didn't happen. He said they asked her *Page 1185 
something about hunting on the property, that her husband had told them that it would be okay to come down and check out the property. At which time he said she went to the telephone and made a phone call and came back to the door and told them she had talked to her husband and he said it was okay for them to check out the property. He stated that he and Mr. Smith walked into the wooded area behind the house on the back side of the pond and stayed back there for some time. He had no idea how long. He said they came back to the house. He and Mr. Smith were wearing cotton gloves because it was raining and cool that morning. They went back to the door and asked to use the bathroom and that Mrs. Sennett allowed them to come into the house. John said that when he went into the bathroom he pulled on some cotton socks over his hands and after he left the bathroom that he went through the kitchen and they jumped Mrs. Sennett and starting hitting her trying to knock her down. That he had [taken] along a piece of galvanized pipe to the house with him and that Kenny had the knife. He said that Kenny Smith did all of the stabbing. I asked him that a couple of times and he gave me the same answer both times that Kenny did all the stabbing to Mrs. Sennett. He said they hit her with a piece of pipe and with some other things there in the den and on one occasion used this small blue chair to hold her down so they could get her to be unconscious. When he mentioned the chair he made some sort of indication toward the head and shoulder area. He stated at one time he hit Mrs. Sennett squarely on top of the head and knocked her back against the rock fireplace and that she was asking them not to hurt her. He said he did not remember covering Mrs. Sennett with anything while he was there. He did say they took a VCR and he did state the following day that they — he found a stereo in his car that he threw in the river. He stated that Kenny took that VCR with him that afternoon. He said that he did not recall throwing any items into the pond. That he had upon leaving Mrs. Sennett's home had gotten back into his car and drove to Billy Gray Williams's house located on Tuscaloosa Street in Florence where they collected the remainder of their $1,000 a piece, which his was $900. He stated he had been given a hundred dollars the day before to go buy a handgun and that he had spent that on drugs to shoot up. He said they were supposed to make the house appear as though it was a burglary gone bad so they broke out the medicine cabinet windows, the doors in the medicine cabinet, and turned some things over and messed some things up in the house. He stated that Billy Williams was to hold the money and pay them after the job was done. He stated that the clothing that he had on [on] the day of the murder, that he had burned them. . . ."
May testified on cross-examination, in pertinent part, as follows:
 "Q. Now, I believe that it is correct that John Parker did not tell you how many times Mrs. Sennett was stabbed?
"A. No, sir.
"Q. Nor where?
"A. No, sir.
 "Q. And I believe that I'm correct that you said that John Parker said that he did not know how [Mrs. Sennett] got covered up?
 "A. To the best of my recollection that's what he said, sir. That he didn't recall how she got covered up.
 "Q. But when you found her she was covered with an afghan that had, I believe, twenty-three holes, is that correct?
"A. That's what Mr. Kilbourn stated, yes, sir.
". . . .
 "Q. And I believe — am I correct that John Parker did not tell you whether or not Mrs. Sennett was alive at the time they left, is that correct?
 "A. No, sir, I was going to get back around to that point when he became upset and said he didn't want to say anything else. He did not say that, no, sir. *Page 1186 
 "Q. Now, did John Parker tell you that they did not turn over the china cabinet?
"A. Yes, sir, he did.
 "Q. When you arrived there at the scene on March the 18th, 1988, tell the jury again the condition of the china cabinet?
 "A. The china hutch was located as you enter the den, to your right as you enter the area of the den. The base of the china hutch was still in place. The upper portion was turned and pushed forward and the upper left hand corner of the hutch as you face it — upper right hand corner as you face it was leaned or propped up on a chair there near the dining room table and all the china and dishes and things were strewn forward toward the den."
Although Parker's attorneys attempted to cast doubt on certain parts of May's testimony by questioning him as to why he had not made more extensive notes following his interview with Parker, they primarily attempted to show that Parker's statement was basically consistent with Parker's theory of the case. One of Parker's attorneys stipulated during closing argument that Parker had gone to the Sennett residence with Smith on the day of the murder and that Parker and Smith had assaulted Mrs. Sennett. Parker's attorney argued to the jury that it could find from the evidence presented that Parker was not present at the Sennett residence at the time Mrs. Sennett was killed and that the survival knife was not the murder weapon. He further argued to the jury that, consistent with May's testimony, Charles Sennett, not Parker, had covered Mrs. Sennett's face with the afghan and then stabbed her to death, and that Charles Sennett had turned over the china cabinet in an attempt to make it appear more convincing that Mrs. Sennett had been killed during a burglary. Parker's attorney also suggested to the jury that Parker told May that Smith had stabbed Mrs. Sennett because, his attorney contended, Parker knew that he had not done it. In other words, Parker took the position that his statement to May was based on an assumption that because Mrs. Sennett had been stabbed on the day that he and Smith were at her house, then Smith must have stabbed her. A careful reading of May's testimony shows that it was not inconsistent with Parker's "assault" theory of the case.
Furthermore, the prosecutors told the jury that its decision should be based on the evidence. One of Parker's attorneys made the following statement to the jury during his closing argument: "Think about what you've heard from the witness stand. Remember what I had to say and what Mr. Hudson or Mr. Alverson are going to have to say is not evidence." In addition, the trial court had given the following instruction to the jury prior to the opening arguments: "[A]n attorney's statements and an attorney's arguments are not evidence and you should disregard any remark, statement, or argument which is not supported by the evidence or by the law as given to you by the court." Also, the trial court gave the following instruction immediately after the closing arguments:
 "In determining what the true facts are in the case, you are limited to the evidence that has been presented from the witness stand as opposed to matters that have been stated by the attorneys in the course of the trial. What the attorneys have said both for the state and for the defendant is not evidence in the case. What they have argued to you at various points in the trial is not evidence. They have a right and they have a duty at the appropriate time in the trial to comment on the evidence and draw reasonable inferences from the evidence as they argue their respect[ive] positions to you. What they say is not evidence and you should put what they say in a proper category in your thinking and it should not be in the evidence category, just as the indictment in the case should not be in the evidence category."
We need not decide whether the prosecutors' remarks would have constituted plain error if May had testified that Parker had admitted to killing Mrs. Sennett. Suffice it to say that we agree with the Court of Criminal Appeals that with regard to May *Page 1187 
the remarks, given their context, did not constitute plain error.
Teddy Lynn White, a convicted felon, testified that Parker had tried to buy a gun from him prior to the date on which Mrs. Sennett was murdered. White further testified that Parker told him at the time that he tried to buy the gun that he (Parker) had been hired to kill someone. One of Parker's attorneys sought to impeach White's testimony by eliciting from White the fact that White had been convicted of burglary; the fact that Parker's live-in girlfriend had had a child by White; and the fact that White was aware that Parker had previously provided information to the police concerning White's criminal activities. Therefore, whether White's testimony was credible was also an important issue that had to be resolved by the jury. Again, the Court of Criminal Appeals correctly recognized in its opinion that the prosecutors had made the remarks relating to the truthfulness of the state's witnesses in an improper attempt to bolster White's testimony by personally vouching for his credibility (as well as for May's), but that the remarks did not undermine the fundamental fairness of the trial. We agree with the Court of Criminal Appeals that with regard to White the prosecutors' remarks did not rise to the level of plain error. Although we do not condone their remarks, in personally vouching for the credibility of White neither prosecutor stated the witness's name, as Mr. Hudson did with respect to Investigator May. For this reason, and because of the clear admonitions given to the jury by the attorneys and the trial court to base its decision on the evidence alone and not on the statements made by the attorneys during closing arguments, we conclude that Parker's right to a fair trial was not adversely affected by the prosecutors' remarks.
Although we are acutely aware that "[a] criminal trial does not unfold like a play with actors following a script,"Geders v. United States, 425 U.S. 80, 86, 96 S.Ct. 1330, 1334,47 L.Ed.2d 592 (1976), and that an attorney caught up in the passion of a jury argument may occasionally say too much, we nonetheless cannot overlook the fact that prosecutors must avoid making personal guarantees as to the credibility of the state's witnesses. Remarks such as those made by the prosecutors in this case constitute error and, under the appropriate circumstances, would require the reversal of a conviction.
The judgment of the Court of Criminal Appeals is affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, SHORES, ADAMS, STEAGALL, KENNEDY and INGRAM, JJ., concur.