[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1001 
Jeffery Day Rieber was indicted and convicted in Madison County for the capital offense stated in Ala. Code 1975, §13A-5-40(a)(2), *Page 1002 
involving the robbery and murder of Glenda Craig. The Court of Criminal Appeals affirmed Rieber's conviction and death sentence, and it later overruled his application for rehearing. See Rieber v. State, 663 So.2d 985 (Ala.Crim.App. 1994), for a detailed statement of the facts. We granted certiorari review pursuant to Rule 39(c), Ala.R.App.P.
The Court of Criminal Appeals correctly resolved the issues discussed in its opinion. We find it necessary to comment on only three of those issues — whether Rieber's statement to the police and the evidence that was seized from his automobile and residence should have been excluded as the fruits of an illegal arrest and search; whether the jury override provision, §13A-5-47, is unconstitutional; and whether there is sufficient evidence to support the trial court's finding of the aggravating circumstance set out in § 13A-5-49(8) (that the offense was especially heinous, atrocious, or cruel).
Rieber contends that his statement to the police, as well as the evidence seized from his automobile and his residence, should have been excluded because the police took him into custody and searched his residence without first obtaining arrest and search warrants. In Payton v. New York,445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the United States Supreme Court held that the Fourth Amendment to the United States Constitution prohibits the police from entering an individual's residence without his consent to make a routine warrantless felony arrest. As the Court of Criminal Appeals noted, however, such an entry may be proper where probable cause to arrest the suspect exists and exigent circumstances make it imprudent for the police to wait for a warrant to be obtained. After carefully reviewing the record, we agree with the majority of the Court of Criminal Appeals that both probable cause to arrest and exigent circumstances existed in the present case.
In United States v. Standridge, 810 F.2d 1034, 1037 (11th Cir. 1987), cert. denied, 481 U.S. 1072, 107 S.Ct. 2468,95 L.Ed.2d 877 (1987), the Eleventh Circuit Court of Appeals noted:
 "Exigent circumstances do not necessarily involve 'hot pursuit' of a fleeing criminal. Factors which indicate exigent circumstances include: (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) a reasonable belief that the suspect is armed; (3) probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that delay could cause the escape of the suspect or the destruction of essential evidence, or jeopardize the safety of officers or the public. See Dorman v. United States, 435 F.2d 385, 392-93 (D.C. Cir. 1970) (en banc); United States v. Campbell, 581 F.2d 22, 25-27 (2d Cir. 1978); United States v. Newbern, 731 F.2d 744, 748-49 (11th Cir. 1984); United States v. Roper, 681 F.2d 1354, 1357 n. 1 (11th Cir. 1982) (dictum), cert. denied sub nom. Newton v. United States, 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983)."
See, also, United States v. Kimmons, 965 F.2d 1001 (11th Cir. 1992), cert. denied, 506 U.S. 1086, 113 S.Ct. 1065,122 L.Ed.2d 370 (1993); and Bush v. State, 523 So.2d 538 (Ala.Crim.App. 1988), and the authorities cited therein. The record indicates that the decision to arrest Rieber at his residence without a warrant was made by the police during an unfolding investigation that began shortly after 8:00 p.m. on October 9, 1990, and extended through the early morning hours of the next day. Rieber was arrested between 3:00 and 3:30 a.m. The police had probable cause to believe that Rieber had robbed and brutally murdered Ms. Craig; that he was residing in his mother's mobile home; that he was armed and extremely dangerous; and, given the gravity of the offense, that his probable state of mind made it likely that any significant delay could allow Rieber to flee the area or otherwise jeopardize the safety of the general public or that of the other occupants of the mobile home in which Rieber was residing. These circumstances were sufficiently exigent to justify a warrantless arrest.
However, we note, as Judges Bowen and Taylor pointed out in their opinion concurring in the judgment, that even if there had *Page 1003 
been no exigent circumstances surrounding Rieber's arrest, his statement, as well as the evidence discovered as a result of his statement (the gun, ammunition, and money), would have been admissible under the rule stated in New York v. Harris,495 U.S. 14, 21, 110 S.Ct. 1640, 1644-45, 109 L.Ed.2d 13 (1990) ("where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of Payton"). The record indicates that the money and Rieber's clothes were seized pursuant to a consensual search of Rieber's residence (both Rieber's mother, who owned the mobile home, and his sister, who also resided there, consented to the search) and that the gun and ammunition were seized from his automobile pursuant to a valid search warrant.
As to the constitutionality of § 13A-5-47, which makes the jury's sentencing recommendation nonbinding on the trial court, see, in addition to those authorities cited by the Court of Criminal Appeals, Harris v. Alabama, ___ U.S. ___,115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (decided after the Court of Criminal Appeals had issued its opinion in the present case).
Rieber further contends that Ms. Craig's murder was not especially heinous, atrocious, or cruel, an aggravating circumstance on which the jury was instructed and which the trial court found to exist. See § 13A-5-49(8). Rieber argues that the evidence did not support the trial court's finding that the killing was conscienceless or pitiless and unnecessarily torturous to Ms. Craig, within the meaning of Exparte Kyzer, 399 So.2d 330 (Ala. 1981).
The Court of Criminal Appeals set out in its opinion the trial court's findings with respect to this issue. Suffice it to say that the evidence supports those findings. The evidence indicates that Rieber had "cased" the store and had stalked Ms. Craig for several days before the murder. Testimony and the videotape from the surveillance camera at the store clearly indicate that Ms. Craig was aware of Rieber's presence and was apprehensive and afraid of him.[1] As the Court of Criminal Appeals pointed out, evidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. Ex parte Whisenhant,555 So.2d 235, 243-44 (Ala. 1989), cert. denied, 496 U.S. 943,110 S.Ct. 3230, 110 L.Ed.2d 676 (1990); White v. State,587 So.2d 1218, 1234 (Ala.Crim.App. 1990), aff'd, 587 So.2d 1236
(Ala. 1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979,117 L.Ed.2d 142 (1992); Lawhorn v. State, 581 So.2d 1159, 1175, n. 7 (Ala.Crim.App. 1990), aff'd, 581 So.2d 1179 (Ala. 1991), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463
(1991). Furthermore, the evidence clearly shows that Ms. Craig was the victim of a brutal execution-style murder. In this regard, this case is materially indistinguishable from Bush v.State, 431 So.2d 555, 560-61 (Ala.Crim.App. 1982), aff'd,431 So.2d 563 (Ala. 1983), cert. denied, 464 U.S. 865,104 S.Ct. 200, 78 L.Ed.2d 175 (1983), wherein the Court of Criminal Appeals aptly noted:
 "And thirdly, for the reasons set out by the trial court, this capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses. Execution-type slayings evincing a cold, calculated design to kill, fall into the category of heinous, atrocious or cruel. Vaught v. State, 410 So.2d 147 (Fla. 1982); Combs v. State, 403 So.2d 418 (Fla. 1981); Armstrong v. State, 399 So.2d 953 (Fla. 1981); Alvord v. State, 322 So.2d 533 (Fla. 1975), cert. denied, 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976). We recognize that an instantaneous death caused by gunfire is not ordinarily a heinous killing. Odom v. State, 403 So.2d 936 (Fla. 1981). However, when a defendant deliberately shoots a victim in the head in a calculated fashion to avoid later identification, after the victim has already been rendered helpless by gunshots to the chest, such 'extremely wicked or shockingly evil' actions may be characterized as especially heinous, atrocious, *Page 1004 
or cruel. Hargrave v. State, 366 So.2d 1, 5 (Fla. 1978)."
See, also, Morrison v. State, 500 So.2d 36 (Ala.Crim.App. 1985), aff'd, 500 So.2d 57 (Ala. 1986), cert. denied,481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987).
We further note that Ms. Craig was alive when she was found by a customer, Connie Balch. Ms. Balch testified as follows:
 "Q. What did you do when you went into the store?
 "A. When I first went in, I walked up and down the candy line, which is the very first aisle when you walk in the store, and I was looking for candy for my two-year-old; and after I got the candy, I went up, and I just laid it on the counter, and then I proceeded to go over and get a Coke, which is on the opposite side of the store.
 "Q. All right. Now, what kind of Coke did you get, small bottle, can, or what?
"A. Three-liter.
". . . .
"Q. All right. And what did you do with it?
 "A. I — well, that's when Mr. [Ronnie] Ashby came in the store.
 "Q. All right. Someone else, a Mr. Ashby, came in?
"A. Right.
". . . .
"Q. And then what occurred?
 "A. I was over there picking up the Coke, and when he walked in, and I — and then I looked at him. I said, 'Ronnie, I wonder where Glenda is.'
"Q. All right. You had not seen the clerk?
"A. No.
"Q. Okay. And then what happened?
 "A. I — he looked at me and said, 'Well, maybe she had to go to the bathroom.' And I said, 'Well, peek in there and see if the door's open or shut.' And he did, and he said, 'No, it's open.' That's when we got scared, and I went over, and I was going to [set] — I [set] my Coke down real hard on the counter, because I was fixing to go back in the back and look for her, and when I [set] my Coke down, that's when she made the sound.
"Q. She made a sound. Where was she?
 "A. She was laying over on the floor behind the counter.
 "Q. And did you then go behind the counter to take a look at her?
 "A. Yes. I looked at Ronnie, and I said, 'Ronnie, there she is. Help me.' And he run out of the store, and I went around and —
"Q. Ms. Balch, did you see any blood?
"A. Yes, sir.
"Q. Whereabouts did you see it?
 "A. There was blood coming out of her mouth, her nose, and then there was a spot on the counter.
". . . .
 "Q. Ms. Balch, after you discovered Glenda laying there, could she talk or say anything to you?
"A. No, sir.
"Q. All right. What did you do?
 "A. When I went back there, and her face was like toward the floor, and she was laying in blood, and she was, you know, choking. You could tell she was choking, and so all I did was, all I knew to do, I just put my arms under hers and [set] her up and proceeded to clean her mouth and her nose out."
Ms. Craig, according to Ronnie Ashby, also had foam oozing from her nose. It was reasonably inferable from the evidence that Ms. Craig suffered greatly from the gunshots to her arm and head. In this respect, this case is materially indistinguishable from Ex parte McNair, 653 So.2d 353 (Ala. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1121,130 L.Ed.2d 1084 (1995); Ex parte Bui, 551 So.2d 1125 (Ala. 1989); and Exparte Jefferson, 473 So.2d 1110 (Ala. 1985), cert. denied,479 U.S. 922, 107 S.Ct. 328, 93 L.Ed.2d 300 (1986), wherein this aggravating circumstance (that the killing was especially heinous, atrocious, or cruel) was found to exist. Although the victims in those cases were viciously cut with knives on and around their throats, they remained alive during, and for a short time after, the attacks. *Page 1005 
Rieber has also raised a number of additional issues that were not presented to the Court of Criminal Appeals. After studying those issues, reviewing Rieber's briefs, and examining the record for error, we can find no basis for reversing the judgment. We do feel, however, that the following issues, which were among the additional issues raised by Rieber in this Court, warrant further discussion: whether reversible error occurred in the guilt phase of the trial as the result of the admission of certain "victim impact" testimony; whether reversible error occurred in the sentencing phase of the trial as the result of the trial court's considering a presentence investigation report that was prepared by the Alabama Board of Pardons and Paroles and which contained a victim impact statement by Ms. Craig's husband; whether reversible error occurred as the result of admitting the surveillance videotape and the testimony of Wayne Gentle, a former high school classmate of Rieber's who identified Rieber as the gunman shown on the videotape; whether reversible error occurred as the result of certain comments made by the prosecutor during the guilt phase of the trial; and whether reversible error occurred in regard to Rieber's claim that he was denied access to possibly exculpatory evidence.
Rieber contends that the admission of victim impact testimony by Ms. Craig's husband during the guilt phase of the trial constituted reversible error. That testimony was as follows:
 "Q. Were you the husband of Ms. Craig at the time of her death?
"A. Yes, sir.
"Q. How long had you been married at that time?
"A. Since '87.
"Q. 1987. Were there any children?
"A. Yes, sir. She had two girls.
 "Q. All right. Were these two girls by a previous marriage?
"A. Yes, sir.
 "Q. And what were their names and ages, please, sir?
 "A. Karen and Karla Nations. Karla was five, and Karen was seven.
 "Q. All right. And did these two children, ages five and seven, did they reside with you and your wife at the time of her death?
"A. Yes, sir.
". . . .
"Q. Where are your daughters now?
"A. In North Carolina.
"Q. Now, these were your stepdaughters?
"A. Right.
 "Q. And so after Glenda's death, they went back to live with other people?
"A. Right. Their grandparents.
"Q. Their grandparents?
"A. Yes."
Rieber argues that Mr. Craig's testimony "shifted the focus toward the victim's tragedy and away from the issue of proof beyond a reasonable doubt."
We agree with Rieber that Mr. Craig's testimony concerning Ms. Craig's children, their ages, and the status of their custody after the murder was not relevant with respect to the question of his guilt or innocence and, therefore, that it was inadmissible in the guilt phase of the trial. The only issue before the jury during the guilt phase of the trial was whether Rieber had robbed and killed Ms. Craig. However, in Ex parteCrymes, 630 So.2d 125 (Ala. 1993), a plurality of this Court held in a capital murder case in which the defendant was sentenced to life-imprisonment without parole that a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant. See, also, Giles v. State, 632 So.2d 568
(Ala.Crim.App. 1992), aff'd, 632 So.2d 577 (Ala. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994); Ex parteParker, 610 So.2d 1181 (Ala. 1992), cert. denied, ___ U.S. ___,113 S.Ct. 3053, 125 L.Ed.2d 737 (1993); Lawhorn v. State, supra; Hooks v. State, 534 So.2d 329 (Ala.Crim.App. 1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050,109 S.Ct. 883, 102 L.Ed.2d 1005 (1989); and Ex parteWhisenhant, supra, applying a *Page 1006 
harmless error analysis in death penalty cases. Our review of the record indicates that Rieber's attorneys did not object to Mr. Craig's brief references to Ms. Craig's children or ask him any questions on cross-examination. The trial court clearly instructed the jury that it had to determine, based on all of the evidence, whether Rieber had robbed and killed Ms. Craig. The jury was instructed that it could not find Rieber guilty unless the prosecutor had established his guilt beyond a reasonable doubt. The jury was also instructed not to let sympathy or prejudice affect its verdict. We caution prosecutors that the introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law. However, after examining the record in its entirety, we conclude that the aforementioned portions of Mr. Craig's testimony, although they should not have been permitted, did not operate to deny Rieber a fair trial. It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that Rieber did not receive a fair trial simply because the jurors were told what they probably had already suspected — that Ms. Craig was not a "human island," but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter's opinion concurring in the judgment in Paynev. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615,115 L.Ed.2d 720 (1991)).
In addition, Rieber contends that the trial court considered, and based his death sentence on, Mr. Craig's victim impact statement that was included in the presentence investigation report, and that it was reversible error for the court to do so. Mr. Craig's statement included his perceptions as to how his wife's murder had affected him and his family. Mr. Craig also expressed his opinions about the crime, about Rieber, and about the appropriateness of a death sentence. Mr. Craig's statement consisted of three paragraphs, covering two pages in a 37-page report (including, among other things, details of the crime, evidence of mitigating and aggravating circumstances, Rieber's criminal record and personal history, and a number of letters written on Rieber's behalf). The trial court stated in its sentencing order that it had "ordered and received" the report. The trial court also stated that it had considered the report in making its determination that Rieber had no significant history of prior criminal activity. In concluding that death was the appropriate sentence, the trial court noted that it had "carefully weighed the aggravating and the mitigating circumstances" that it found to exist and that it had "given [heavy] consideration to the [mitigating circumstances and the] recommendation of the jury contained in its advisory verdict." There is no indication in the sentencing order that the trial court considered Mr. Craig's statement in sentencing Rieber, much less an indication that it based its sentence, even in part, on that statement.
In Ex parte Martin, 548 So.2d 496, 497-98 (Ala. 1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989), this Court wrote:
 "Martin next contends that the introduction of victim impact information at the sentencing phase of the trial violated the Eighth and Fourteenth Amendments to the United States Constitution.
 "After the jury had rendered its advisory verdict in the sentencing phase of the trial, but before the trial court had pronounced sentence, a 'presentence report' was filed by the Alabama Board of Pardons and Paroles. That report contained the following statement, which, Martin contends, violates the Eighth and Fourteenth Amendments:
 " 'It is the belief of this officer that this offense has had a significant impact on the lifestyle of [the victim's wife]. She is now a single parent whose son has lost his father. She reports that her life has changed socially, emotionally, and that she is very paranoid, often nervous and very easily upset.' *Page 1007 
 "In Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the Court held that the introduction at the sentencing phase of a capital murder trial in state court of a victim impact statement, describing the effect of the crime on the victim's family, violates the Eighth Amendment. This case, however, differs from Booth.
 "In Booth, the victim impact statement was submitted to the jury for its consideration. In the present case, the presentence report was not presented to the jury, but was presented to the court. We also note that the victim impact information comprises only three sentences in a 36-page report that contains, among other things, details of the offense, mitigating and aggravating circumstances, Martin's criminal record, and Martin's personal history. We hold that the introduction of the presentence report containing the above statement was not error."
(Emphasis in original.) See, also, Haney v. State,603 So.2d 368 (Ala.Crim.App. 1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687
(1993); and Pierce v. State, 586 So.2d 1005 (Ala.Crim.App. 1991), wherein the Court of Criminal Appeals remanded for new sentencing hearings. In Haney, the Court was faced with a "substantial" victim impact statement that was " 'carefully read, studied and considered' " by the trial court " 'before arriving at the final decision determining the sentence.' " 603 So.2d at 382, quoting the trial court's sentencing order. InPierce, there was no specific indication that the trial court had considered the victim impact statement contained in the presentence investigation report. Although in Haney andPierce the Court of Criminal Appeals chose to remand for new sentencing hearings, out of "an abundance of caution," a remand is not required in every death penalty case in which a victim impact statement appears in a presentence investigation report.Ex parte Martin, supra. We note that Mr. Craig's statements with respect to the murder's impact on him and on his family were properly before the trial court during the sentencing phase. See Payne v. Tennessee, supra, partially overrulingBooth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440
(1987), and South Carolina v. Gathers, 490 U.S. 805,109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). However, the Payne Court did not overrule the rule stated in Booth prohibiting consideration of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence during the sentencing phase of a capital murder trial. See501 U.S. at 830, n. 2, 111 S.Ct. at 2611 n. 2. In any event, we conclude, based on the record before us (indicating that Mr. Craig's statements about the crime, about Rieber, and about the appropriateness of a death sentence, comprised only a portion of the three paragraphs in the victim impact statement), that the rule stated in Ex parte Martin controls this case.
Rieber also contends that it was reversible error to admit the surveillance videotape into evidence. He argues that the videotape was not sufficiently clear to allow anyone to identify him as the gunman depicted in the videotape and, therefore, that the videotape lacked any real probative value and was highly inflammatory. Rieber further argues that the requirements for admissibility of videotapes set out in Exparte Fuller, 620 So.2d 675 (Ala. 1993), were not satisfied. In the alternative, Rieber contends that even if the videotape was properly admitted, it was error to allow Wayne Gentle to testify as to the identity of the gunman shown on the videotape. Gentle, according to Rieber, lacked any special knowledge or expertise in viewing and interpreting videotapes. Rieber maintains that Gentle's in-court identification was impermissibly tainted by what he calls unduly suggestive pretrial identification procedures, lacked any real probative value, and usurped the function of the jury in evaluating the videotape.
After carefully examining the record, including the pertinent portions of the videotape, we agree with the State that the videotape was properly admitted into evidence and that any problem with respect to the clarity of the videotape and Gentle's identification of Rieber as the gunman shown on the videotape would go to the weight accorded the evidence by the jury and not to its admissibility. *Page 1008 
In Ex parte Fuller, supra, at 677-78, this Court stated:
 "Traditionally, courts and commentators analyzing the issue of the admissibility of sound recordings photographs, motion pictures, videotape recordings, maps, and diagrams have treated all these items in the same manner. See 3 James H. Chadbourn, Wigmore on Evidence, § 790 (1970 Supp. 1991); 2 John W. Strong, McCormick on Evidence § 214 (1992); William A. Schroeder, et al., Alabama Evidence, § 11-3 (1987 Supp. 1988); F.M. English, Annotation, Admissibility of Sound Recordings in Evidence, 58 A.L.R.2d 1024 (1958); and see, International UAW-CIO v. Russell, 264 Ala. 456, 470, 88 So.2d 175, 186 (1956) (discussing the 'pictorial communication' theory as applied to motion pictures); National States Ins. Co. v. Jones, 393 So.2d 1361, 1366 (Ala. 1980) (discussing tape recordings); and C.P. Robbins Associates v. Stevens, 53 Ala. App. 432, 437, 301 So.2d 196, 200-01 (1974) (discussing tape recordings). In fact, in National States Insurance, this Court stated, 'A tape recording of a pertinent event is analogous to a photograph of a scene. A recording preserves the situation as it took place just as a photograph preserves the scene as it existed at a given point,' 393 So.2d at 1367.
 "There are two theories upon which photographs, motion pictures, videotapes, sound recordings, and the like are analyzed for admission into evidence: the 'pictorial communication' or 'pictorial testimony' theory and the 'silent witness' theory. Wigmore, supra, § 790; McCormick, supra, § 214; and Schroeder, supra, § 11-3. The 'pictorial communication' theory is that a photograph, etc., is merely a graphic portrayal or static expression of what a qualified and competent witness sensed at the time in question. Wigmore, supra, § 790, and McCormick, supra, § 214. The 'silent witness' theory is that a photograph, etc., is admissible, even in the absence of an observing or sensing witness, because the process or mechanism by which the photograph, etc., is made ensures reliability and trustworthiness. In essence, the process or mechanism substitutes for the witness's senses, and because the process or mechanism is explained before the photograph, etc., is admitted, the trust placed in its truthfulness comes from the proposition that, had a witness been there, the witness would have sensed what the photograph, etc., records. Wigmore, supra, § 790, and McCormick, supra, § 214.
 "A reasonable reading of [Voudrie v. State, 387 So.2d 248 (Ala.Crim.App. 1980), cert. denied, 387 So.2d 256 (Ala. 1980); Carraway v. State, 583 So.2d 993 (Ala.Crim.App. 1991), cert. denied, 583 So.2d 997 (Ala. 1991); Molina v. State, 533 So.2d 701 (Ala.Crim.App. 1988), cert. denied, 489 U.S. 1086, 109 S.Ct. 1547, 103 L.Ed.2d 851 (1989),] and the more recent caselaw of the Court of Criminal Appeals leads us to conclude that the Court of Criminal Appeals is of the opinion that the 'pictorial communication' and 'silent witness' theories are mutually exclusive theories, rather than alternative theories. The proper foundation required for admission into evidence of a sound recording or other medium by which a scene or event is recorded (e.g., a photograph, motion picture, videotape, etc.) depends upon the particular circumstances. If there is no qualified and competent witness who can testify that the sound recording or other medium accurately and reliably represents what he or she sensed at the time in question, then the 'silent witness' foundation must be laid. Under the 'silent witness' theory, a witness must explain how the process or mechanism that created the item works and how the process or mechanism ensures reliability. When the 'silent witness' theory is used, the party seeking to have the sound recording or other medium admitted into evidence must meet the seven-prong Voudrie test. Rewritten to have more general application, the Voudrie standard requires:
 "(1) a showing that the device or process or mechanism that produced the item being offered as evidence was capable of recording what a witness would have seen or heard had a witness been present at the scene or event recorded, *Page 1009 
 "(2) a showing that the operator of the device or process or mechanism was competent,
 "(3) establishment of the authenticity and correctness of the resulting recording, photograph, videotape, etc.
 "(4) a showing that no changes, additions, or deletions have been made.
 "(5) a showing of the manner in which the recording, photograph, videotape, etc., was preserved.
 "(6) identification of the speakers, or persons pictured, and
 "(7) for criminal cases only, a showing that any statement made in the recording, tape, etc., was voluntarily made without any kind of coercion or improper inducement.[2]
 "On the other hand, when a qualified and competent witness can testify that the sound recording or other medium accurately and reliably represents what the witness sensed at the time in question, then the foundation required is that for the 'pictorial communication' theory. Under this theory, the party offering the item must present sufficient evidence to meet the 'reliable representation' standard, that is, the witness must testify that the witness has sufficient personal knowledge of the scene or events pictured or the sounds recorded and that the item offered accurately and reliably represents the actual scene or sounds."
The videotape in the present case depicts certain scenes in which no witnesses for the State appear, e.g., certain scenes in which only Ms. Craig appears, certain scenes in which Ms. Craig appears with unidentified customers, certain scenes in which Ms. Craig appears with the gunman, etc. The admissibility of the videotape with respect to those scenes must be analyzed under the "silent witness" theory. Our review of the record indicates that the prosecutor laid the necessary evidentiary foundation for admitting those portions of the videotape. Gary Davis, a representative of Management Security, Inc., the company that installed the surveillance system, testified that he had more than 15 years' experience in working with surveillance systems. He further testified as to how the system worked and that the system had been reliable from the day it was installed. Davis testified, in pertinent part, as follows:
 "Q. How long have you been employed with [Management Security, Inc.]?
"A. Three years.
"Q. What are your job duties, please, sir?
 "A. I have actually done various duties there. I have been operations manager, as well as doing technical design.
 "Q. What is your background and training, Mr. Davis?
 "A. I have been working in the security field for closed circuit T.V., fire alarms, burglary equipment, for the past 15 years, during which time I have continued with my education by attending seminars, attended training courses, and so forth.
 "Q. Have you had any particular training on video systems?
"A. Yes, sir, I have.
"Q. What was the nature of that, please, sir?
 "A. I have attended over the years numerous seminars provided by the manufacturer of the various equipment. Management Security, Incorporated, distributes for Vicon, which is one of the major closed circuit television companies, and I have attended several of their seminars.
 "Q. Let me ask you this. At Mobile Mart One, where these events took place, who installed that particular equipment?
"A. A man working for me, Steve Roach.
 "Q. Now, I believe you said you have worked for that particular company for three years; is that correct?
"A. Yes, sir.
"Q. How many years' experience do you have? *Page 1010 
 "A. For the past 15 years, it's the only field I have worked in.
 "Q. Are you familiar with the equipment that was installed in Mobile Mart One on Winchester Road?
"A. Yes, I am.
 "Q. Approximately when was this equipment installed?
"A. It was installed August 27, 1990.
 "Q. And had you inspected that equipment after its installation, or at the time of installation?
"A. Yes, it was thoroughly checked out.
 "Q. Was the equipment, when you checked it out, operating properly?
"A. Yes, it was.
 "Q. Now, describe the equipment. I understand the camera was located back in the north front counter shooting down toward the cash register and front door. Now, was it mounted from a fixture on the floor?
"A. From the ceiling.
"Q. What are the other pieces of equipment?
 "A. A television camera, a black and white 9-inch monitor, which views what it's taking a picture of, and a time-lapse recorder, which records the events.
"Q. Is this a common VCR?
"A. A higher technical version of the VCR.
"Q. Why does it take a higher version?
 A. When you start dealing with constraints, a 24-hour recording situation — well, your standard recorder is only capable of recording up to 8 hours, and that's cumbersome, changing tapes and things like that. These systems are designed to be able, not only to handle a continuous load operation day and night, but also they are set up to where they can actually increase the record time by not taking every frame or recording every frame that the camera sees but various [sequences] of the frames.
 "Q. Now, this particular camera, how was it set up time-wise?
 "A. Okay. It was taking or recording frames every four seconds.
 "Q. Is the sequence like the camera is taking a still photograph every four seconds?
"A. Yes, it is real high ST.
 "Q. How do you know — well, how do you know what . . . date and time the photographs are taken?
 "A. The VCR has a time-date generator on it and constantly displays the hour, minute, second, month, date, day, and year.
". . . .
 "Q. Now, Gary, after the events occurred, have you visited the premises where this equipment was located.
"A. Yes, I have.
 "Q. And what about the operation of the equipment subsequent to this event?
 "A. It was still functioning properly. There was a maintenance agreement with the company. It was our duty to keep the equipment operational, so it was actually continuously checked.
 "Q. In that regard, the maintenance required periodic checks in addition to you may get calls in between times for particular troubles that may occur; is that correct?
 "A. Well, its not a requirement; however, its management policy to maintain the equipment.
 "Q. When you say maintain the equipment, what kind of maintenance are we talking about?
 "A. Really, to make sure that the heads on the VCR are cleaned regularly and to be sure that it is functioning properly; mainly, just routine checks of the system.
 "Q. Were the date and time display — would you see that it was operating correctly?
"A. Yes, we would.
 "Q. What about the time mechanism, is it very stable?
 "A. It is an extremely stable device. Again, this is a component that is designed in with the idea in mind they're going to be used sometimes in court cases, and so forth. *Page 1011 
". . . .
 "Q. Let me ask you one other thing. Was this particular system noted to have any problems of any kind?
 "A. We had not had any problems noted since installation.
". . . .
 "Q. Mr. Davis, did you see anything reproduced there on this tape or the pictures displayed that led you to believe there was any type of malfunction at all in the equipment?
"A. None at all."
Likewise, Linda Sue Newmeyer, the store's manager, testified as follows:
 "Q. Were you familiar with the video system that had been installed?
"A. Yes, I was.
 "Q. Did you have any duty in regard to the video?
"A. I viewed the tapes every day.
 "Q. Now, during the time that the video system was there in the Mobile Mart One and it was your duty to view those films, did the system break down or did you have any trouble with the system malfunctioning and you called maintenance?
"A. No, sir."
The State also presented the testimony of the police officers involved in the investigation, establishing the chain of custody of the videotape and the manner in which the videotape had been removed from the video cassette recorder and preserved for later viewing.
The videotape also depicts certain scenes in which several witnesses for the State appear. The admissibility of the videotape with respect to those scenes must be analyzed under the "pictorial communication" theory. Our review of the record also indicates that the prosecutor laid the necessary evidentiary foundation for admitting those portions of the videotape. The prosecutor presented sufficient evidence to satisfy the "reliable representation" standard by soliciting testimony from each of the witnesses shown on the videotape that the videotape accurately and reliably represented the actual scene in which the witness appeared.
As to Rieber's contention that Wayne Gentle should not have been allowed to testify that Rieber was the gunman shown on the videotape, we note that we are aware of no rule (and Rieber does not cite us to one) preventing a lay witness from testifying to facts that are within his personal knowledge. See J. Colquitt, Alabama Law of Evidence, §§ 7.0, 7.1 (1990), and the cases cited therein; C. Gamble, McElroy's Alabama Evidence, § 127.01 (4th ed. 1991), and the cases cited therein. Gentle testified that he had been a high school classmate of Rieber; that he knew Rieber when he saw him; and that he had seen and spoken to Rieber at the store at approximately 5:00 p.m. on the day of the murder. The record indicates that Gentle's identification of Rieber as the gunman shown on the videotape was based on his personal knowledge of Rieber's physical characteristics and on his appearance on the day of the murder.
We also note Rieber's contentions that Gentle's identification testimony was impermissibly tainted by what Rieber calls an unduly suggestive pretrial identification procedure and that it constituted a non-expert opinion that usurped the function of the jury in evaluating the videotape. However, our review of the record reveals no unduly suggestive pretrial identification procedure. The evidence indicates that Gentle had given Rieber's name to the police before he viewed the videotape. Although Gentle may have suspected that Rieber might have committed the murder, the undisputed evidence shows that the police did not suggest to Gentle that Rieber might be involved and did not tell him anything about who he was supposed to be looking for in the videotape. Furthermore, even if we were to agree with Rieber's characterization of Gentle's testimony as an opinion, and we do not, our conclusion as to the admissibility of Gentle's testimony would not be different. Gentle personally observed Rieber on the day of the murder. At that time, according to Gentle, Rieber was wearing a light colored T-shirt and a ball cap, and he had darker hair than he had at the trial. The record indicates that Rieber had cut his hair before the trial commenced; he wore a gray suit in court. It is *Page 1012 
well settled that if a lay witness is better qualified or in a better position than the jury to draw inferences from the facts, then it is permissible for that witness to express an opinion or to draw a conclusion from those facts personally observed by or known to the witness. Colquitt, Alabama Law ofEvidence, supra; McElroy's, supra; Wright v. Rowland,406 So.2d 830 (Ala. 1981).
Rieber further contends that several comments made by the prosecutor during his closing argument in the guilt phase of the trial constituted reversible error. Rieber argues that these comments pertained to the impact that the murder had had on Ms. Craig's family and expressed the prosecutor's personal opinions as to the credibility of the State's witnesses and as to the fact of Rieber's guilt. After carefully reviewing the prosecutor's closing argument, we conclude that the comments complained of either were within the scope of permissible argument, or, if they were outside that scope, did not undermine the fundamental fairness of the trial.
Immediately before the prosecutor began his closing argument, the trial court instructed the jury as follows:
 "Once again, I will admonish you that the statements these attorneys make to you are not testimony and they are not evidence, and they are not to be considered by you as such. They are simply statements made by them as to what they believe the evidence has shown on behalf of each of their cases."
The prosecutor then made the following comments, to which Rieber made no objections:
 "Ladies and Gentlemen, we appreciate your patience. It's been a difficult case to present and all.
 "I want to talk to you about mercy. God forbid that the element of mercy should ever be missing from our courtrooms; and, you know, as human beings, its much easier to concentrate our thoughts of mercy upon the defendant. He's alive. He is present in the courtroom, or we wouldn't be human.
 "Where is the victim? She's not here. She can't be here, and that's why I have this family portrait (indicating). It's an old portrait of her. It's the only one that the family had. So when you think about mercy, remember there's more than one person that's entitled to mercy, to your thoughts of mercy, not just this defendant (indicating), who is fortunate enough to be sitting here.
 "What about this young lady (indicating)? I'm sorry she can't be here with us today to tell us about her side, tell [us] about her pain and suffering. But it is not her fault that she's not here. You know — and she is not the only person to be considered. What about her family, her husband? His wife, his love, his mate is gone forever, taken from him, summarily ripped from his life. His two stepdaughters are gone, taken from him. What about the parents of this poor victim and other relatives and friends? Look at the vacuum that this has created, and who are the worst victims of all? When we're talking about being merciful? What mercy has been shown Karla, age five, Karen, age seven?
 "These children will never know their mother's caress again in their lives. In times of emotional distress, physical pain, they will never have their mother's guidance on matters of life. She'll never be able to help them with their homework. Why? When you talk about mercy, don't be one-sided."
(Emphasis added.) In rebuttal to the closing argument of Rieber's attorney, the prosecutor stated:
 "Now, that goes back to my opening remarks when we talked about mercy. Don't forget this lady (indicating) and her family and her children are just as entitled to mercy, consideration, and a fair trial at your hands as is this defendant, if not more so.
". . . .
 ". . . [Glenda Craig has] been removed from our midst by the summary action on the part of this person's (indicating) cold-blooded, heartless, atrocious act. [Rieber] just walked up there and blew that woman away and left those children without their mother." *Page 1013 
 (Emphasis added.) In its instructions to the jury following the closing arguments in the guilt phase, the trial court reminded the jury: "Do not let sympathy, bias, or prejudice have anything to do with your verdict in this case."
In Ex parte Parker, supra, 610 So.2d at 1183-84, this Court stated:
 "However, the Court of Criminal Appeals also correctly recognized that whether the prosecutors' remarks constituted plain error depended on whether those remarks, when viewed in the context of the entire closing argument and in the context of the entire trial, undermined the fundamental fairness of the trial and, thus, constituted a miscarriage of justice. See Ex parte Smith, 581 So.2d 531, 532 (Ala. 1991) (' "[p]lain error" exists when the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the proceedings . . .; in other words, "plain error" exists when a substantial right of the defendant has or probably has been adversely affected.') In United States v. Young, supra, 470 U.S. [1], at 11, 12, 16, 105 S.Ct. [1038], at 1044, 1045, 1047. [1985] . . . the Court noted:
 " 'Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. Instead, . . . the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's [remark] would have on the jury's ability to judge the evidence fairly. . . .
" '. . . .
 " 'Especially when addressing [a claim of] plain error, a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record. We have been reminded:
 " ' "In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution." Johnson v. United States, 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring).
 " 'It is simply not possible for an appellate court to assess the seriousness of the claimed error by any other means. As the Court stated in United States v. Socony-Vacuum Oil Co., 310 U.S. [150], at 240, 60 S.Ct. [811], at 852 [1940], 'each case necessarily turns on its own facts.' "
 "Considering these principles, we cannot say that the prosecutors' remarks rose to the level of plain error. Viewed in context, these remarks, although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial. This conclusion is based on our exhaustive review of the record, particularly the prosecutors' remarks during closing argument; May's testimony; Parker's statements and arguments that showed his theory of the case; and the trial court's oral charge to the jury."
In Racine v. State, 290 Ala. 225, 226, 275 So.2d 655, 656
(1973), this Court noted:
 "In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, no fixed standard can be applied, and each case must be judged on its on merits. Smith v. State, 282 Ala. 268, 210 So.2d 826 (1968); Bryson v. State, 264 Ala. 111, 84 So.2d 785 (1955). As stated by Judge Harwood, in Bullard v. State, 40 Ala. App. 641, 645, 120 So.2d 580, 584 (1960):
 " 'Of necessity a wide discretion must be allowed the trial judge in regulating the argument of counsel. Trials are adversary in nature. Vigorous prosecution and defense [are] to be expected. Neither defense counsel nor the prosecutor should be too closely hampered by niceties of speech if he is to be effective, but should be permitted to say his say in his own style. This of course does not mean that unfair and prejudicial argument is to be condoned for one instant.' " *Page 1014 
We agree with Rieber that it was improper for the prosecutor to base part of his closing comments on those portions of Mr. Craig's victim impact testimony. As previously noted, Mr. Craig's testimony as to the impact that the murder had had on Ms. Craig's family was irrelevant during the guilt phase of the trial. However, just as we do not view Mr. Craig's testimony as constituting reversible error, neither do we view the prosecutor's comments with respect to that testimony as being so prejudicial as to require a new trial. We again caution prosecutors that victim impact commentary during closing arguments in the guilt phase of a capital murder trial, like victim impact evidence introduced during the guilt phase, can result in reversible error if the record indicates that it probably has led to a verdict based on sympathy and passion instead of deliberation. However, we cannot reasonably conclude that the prosecutor's comments in this particular case, when considered in the context of the entire trial, were so prejudicial as to call into question the correctness of the verdict.
Furthermore, we view those comments that the prosecutor prefaced with "I think," "I believe," "I feel," "I am satisfied," and "I have no doubt," as expressing his reasonable impressions from the evidence. The prosecutor was allowed to argue every legitimate inference from the evidence, and the trial court was afforded wide discretion in regulating his comments. We note, however, that even if these comments were to be viewed as expressions of the prosecutor's personal opinions and, thus, as "crossing the line" of permissible argument, they, nonetheless, would not constitute reversible error. There is no fixed standard for determining whether a prosecutor's comments so prejudiced the factfinding process as to require a new trial. Each case must be judged on its own merits.Hooks v. State, supra; Racine v. State, supra. These remarks by the prosecutor were not as potentially prejudicial as those of the prosecutors in Ex parte Parker, supra, wherein we held that the prosecutors' remarks did not undermine the fundamental fairness of the trial. We further note that the prosecutor, referring to State's witness Tommy Erskine, stated: "He was extremely believable to me." This isolated comment, although improperly expressing the prosecutor's personal opinion as to Erskine's credibility, likewise did not constitute reversible error. Ex parte Parker.
As a final matter, we note Rieber's contention that his right to due process was violated when a police technician commingled "live" ammunition found in the gun seized from Rieber's automobile with other "live" ammunition found in a box in that automobile. The record indicates that Rieber's attorney discovered this commingling during his cross-examination of the technician. Rieber argues that an unfired shell that was found by the technician in the gun's cylinder between two fired shell casings was placed in the box with other unfired shells (including the shells from the gun, the box contained approximately 14 shells) and that if he had known about the commingling of the shells and had had the opportunity to examine that unfired shell he could possibly have shown that the shell had misfired. Such a showing, according to Rieber, would have supported a finding that the bullets that struck Ms. Craig had been fired in "rapid succession." Rieber argues that such a finding would have been exculpatory.
After carefully reviewing the record, we conclude that, contrary to Rieber's contentions, the police did not destroy any evidence. The police technician who handled the ammunition testified that he saw no unusual markings on the unfired shell in question that would have indicated that it had misfired. All of the shells in the box found in Rieber's automobile were available for examination or testing by Rieber's attorneys; however, the record does not indicate that they sought a continuance of the trial for such purposes once they learned that the shells had been commingled.
We further note that even in those cases where evidence is actually lost or destroyed by the police and, thus, is unavailable for inspection and testing by the defendant, there is no due process violation unless the police acted in bad faith in handling the evidence or the evidence destroyed was so critical to the defense that its destruction renders the trial fundamentally unfair. See *Page 1015 Ex parte Gingo, 605 So.2d 1237 (Ala. 1992), discussing Arizonav. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281
(1988). The record here indicates no bad faith on the part of the police. The police technician who handled the evidence testified that he saw no indication that the unfired shell had any evidentiary value. Furthermore, we question Rieber's unsupported conclusion that one could reasonably infer from a finding that the shell had misfired that the two bullets that struck Ms. Craig were fired in rapid succession. The evidence at trial was inconclusive as to exactly how quickly the gunman may have fired. It is certainly reasonable to conclude from viewing the videotape that the two shots were fired within a matter of seconds. However, the unfired shell between the two fired shell casings in the gun's cylinder indicates nothing more than that the gun either misfired or, as the evidence also suggests, that the gun's cylinder rotated for some reason after the first shot was fired but before the second shot was fired. It would be speculative at best to say, even based upon forensic evidence that the gun had misfired, that the second bullet that struck Ms. Craig was fired immediately after the first bullet that struck her. Moreover, we fail to see how even a finding that the bullets were fired in rapid succession could be exculpatory. The only issue to which such a finding could be applicable would be whether the murder was especially heinous, atrocious, or cruel. The evidence conclusively shows that Ms. Craig was shot twice; whether the two shots were fired one right after the other, as Rieber contends, or were fired a number of seconds apart, as the state contends, would appear to be of little consequence in view of the suffering, both psychological and physical, that Ms. Craig apparently endured. In any event, it is clear that Rieber's inability to make this argument obviously did not prejudice him in the eyes of the jury, as evidenced by its recommendation that he be sentenced to life imprisonment without parole.
Pursuant to Ala. Code 1975, § 13A-5-53, we have carefully searched the record of both the guilt phase and the sentencing phase of Rieber's trial, and we have found no reversible error. In reviewing the sentence in this case, we find no evidence that it was imposed under the influence of passion, prejudice, or any other arbitrary factor. We find that the guilty verdict and the sentence are supported by the evidence. Our independent weighing of the aggravating and mitigating circumstances convinces us that the sentence of death is appropriate for this defendant. Considering the crime and the defendant, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, the Court of Criminal Appeals properly affirmed Rieber's conviction and sentence of death. That court's judgment is affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, SHORES, INGRAM, COOK, and BUTTS, JJ., concur.
[1] Each of the Justices has viewed the pertinent portions of the videotape.
[2] The videotape did not contain a recorded statement by Rieber; therefore, this requirement was not applicable.