******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* ANTRON GORE
## (SC 20211)

McDonald, D'Auria, Mullins, Kahn,
Ecker and Keller, Js.

*Syllabus*

Pursuant to the applicable provision (§ 7-3 (a)) of the Connecticut Code of
Evidence, testimony in the form of an opinion is generally inadmissible
if it embraces an ultimate issue to be decided by the trier of fact.

Pursuant further to this court's decision in *State* v. *Finan* (275 Conn. 60),
lay opinion testimony identifying a defendant in video surveillance foot-
age had been deemed inadmissible when the identification embraced
an ultimate issue.

Convicted of the crimes of murder and criminal possession of a firearm in
connection with the shooting death of the victim, the defendant appealed
to this court, claiming, inter alia, that the trial court improperly had
admitted the testimony of P, a police officer, that C, a close friend of
the defendant, made a statement identifying the defendant in a still
photograph taken from a surveillance video of the shooting. At the start
of the defendant's trial, the defendant filed a motion in limine, seeking
to preclude the state from introducing C's statement to the police identi-
fying the defendant in the surveillance video and still photograph. The
trial court ruled that C's identification of the defendant in the surveillance
video would constitute lay opinion testimony concerning an ultimate
issue and thus was inadmissible under § 7-3 (a) of the Code of Evidence.
The court, however, left open the possibility that the state could intro-
duce C's identification of the defendant in the still photograph if the
state were able to demonstrate that C had, independently of the video,
identified the subject depicted in the still photograph as the defendant.
During C's testimony at trial, C denied that he ever had identified the
defendant in the still photograph, and P testified, in accordance with
the court's ruling, that C had told him that the subject in the still photo-
graph was the defendant. During deliberations, the jury asked the court if
it could provide the jury with a magnifying glass. Over defense counsel's
objection, the court provided the jury with a magnifying glass supplied
by the state. The jurors submitted a subsequent request for a "better"
magnifying glass, which the trial court denied. After the verdict was
announced, the court learned that some of the jurors had used additional,
unauthorized magnifying glasses to view certain photographs in evi-
dence. The court held a hearing to question the jurors about the matter,
and, on the basis of the answers the jurors provided and its observation
of the additional magnifying glasses, the court denied the defendant's
motion for a mistrial and a new trial based on alleged juror miscon-
duct. *Held*:

1. The defendant could not prevail on his claim that the trial court improperly
   admitted P's testimony that C had identified the subject in the still
   photograph as the defendant:

   a. This court amended § 7-3 (a) of the Connecticut Code of Evidence
   and overruled *Finan* and its progeny, holding that opinion testimony
   that relates to the identification of persons depicted in surveillance
   video or photographs is not inadmissible simply because it embraces an
   ultimate issue and that such lay opinion testimony is admissible if it
   meets the general requirements for the admissibility of such testimony
   set forth in § 7-1 of the Code of Evidence, that is, it is rationally based
   on the perception of the witness and is helpful to a clear understanding
   of the testimony of that witness or the determination of a fact in issue:
   the application of the ultimate issue rule in § 7-3 (a) to identifications
   of criminal defendants in video surveillance footage had spawned a line
   of cases in which courts struggled to draw an illusory distinction between
   fact and opinion testimony and to determine when such identifications
   embrace an ultimate issue, and this court determined that the better
   approach should focus on the relative helpfulness of the testimony
   regarding the identification to the trier of fact versus the potential preju-
   dice that such testimony would pose to the defendant; accordingly, this

court adopted a totality of the circumstances test under which courts are to consider four factors in determining whether there is some basis for concluding that the witness is more likely than the jury to correctly identify the defendant from surveillance video or photographs, including the witness' general familiarity with the defendant's appearance, the witness' familiarity with the defendant's appearance, including items of clothing worn, at the time that the surveillance video or photographs were taken, any change in the defendant's appearance between the time the surveillance video or photographs were taken and the time of trial, or the subject's use of a disguise in the surveillance footage, and the quality of the video of photographs, as well as the extent to which the subject is depicted in the surveillance footage; moreover, with respect to the first factor, the witness' general familiarity with the defendant's appearance, this court declined to join the majority of jurisdictions that adhere to a minimum threshold for general familiarity and concluded, instead, that, in order for this factor to weigh in favor of admitting lay opinion testimony relating to the identification of persons depicted in surveillance footage, the proponent of the testimony must demonstrate that the witness possesses more than a minimal degree of familiarity with the defendant, and trial courts, in considering whether a witness' level of familiarity with the defendant is sufficient to satisfy this factor, should consider the particular, relevant circumstances, including, but not limited to, the frequency, number and duration of any individual prior contacts between the witness and the defendant, the duration of the entire course of contacts and the length of time since the contacts, the relevant viewing conditions, and the nature of the relationship between the witness and the defendant, if any.

b. In the present case, although the record did not reflect whether the defendant's appearance had changed between the time the surveillance video was recorded and the time of trial, C's long-standing and intimate association with the defendant, whom C had known for years, easily satisfied the general familiarity factor, C was familiar with the defendant's appearance when the surveillance footage was recorded, the defendant was not wearing a disguise in that footage, and the quality of the still photograph weighed in favor of admission of the identification testimony, as the trial court found that the subject in the photograph was close enough to the camera and that the subject's face was visible enough to allow for recognition.

2. The trial court acted within its discretion in finding that the defendant had failed to prove that he was prejudiced by the conduct of the jurors in bringing into the deliberations two unauthorized magnifying glasses to assist in their review of the photographic evidence, and, accordingly, the trial court properly denied the defendant's motion for a mistrial and a new trial based on alleged juror misconduct; the trial court found that the additional magnifying glasses did not allow the jury to do anything different or additional beyond what the court provided magnifying glass allowed and did not introduce new evidence or alter existing evidence.

Argued September 17, 2020—officially released February 7, 2022*

*Procedural History*

Information charging the defendant with the crimes of murder and criminal possession of a firearm, brought to the Superior Court in the judicial district of Hartford, where the court, *Schuman, J.*, denied in part the defendant's motion to preclude certain evidence; thereafter, the charge of murder was tried to the jury before *Schuman, J.*; verdict of guilty; subsequently, the charge of criminal possession of a firearm was tried to the court; finding of guilty; thereafter, the court, *Schuman, J.*, rendered judgment in accordance with the jury verdict and the court's finding, from which the defendant appealed to this court. *Affirmed.*

*Julia K. Conlin*, assigned counsel, with whom was *Emily Graner Sexton*, assigned counsel, for the appellant (defendant).

*Linda F. Currie-Zeffiro*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, former state's attorney, and *Chris A. Pelosi*, former senior assistant state's attorney, for the appellee (state).

*Lisa J. Steele* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

*Opinion*

MULLINS, J. When the judges of the Superior Court adopted the Connecticut Code of Evidence in 1999, § 7-3 (a) codified the existing common-law evidentiary rule, which prohibited lay opinion testimony that embraced an ultimate issue to be decided by the trier of fact.[1] In accordance with that rule, this court held, in *State* v. *Finan*, 275 Conn. 60, 66–67, 881 A.2d 187 (2005), that lay opinion testimony identifying a defendant in video surveillance footage is prohibited when that identification embraces an ultimate issue.

In this appeal, we reconsider the wisdom of the "ultimate issue rule" as applied to lay witness identifications of persons depicted in video surveillance footage.[2] In this limited context, we join the majority of federal and state jurisdictions in concluding that the rule is neither tenable nor necessary. Accordingly, we hereby amend § 7-3 (a) of the Connecticut Code of Evidence to incorporate an exception to the ultimate issue rule for lay opinion testimony that relates to the identification of persons depicted in surveillance video or photographs, and overrule *State* v. *Finan*, supra, 275 Conn. 60.[3] As we explain in part I of this opinion, we adopt a totality of the circumstances test for determining whether lay opinion testimony identifying a person in surveillance video or photographs is admissible.

The defendant, Antron Gore, appeals from the judgment of conviction, rendered following a jury trial, of murder in violation of General Statutes § 53a-54a (a), and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1).[4] The defendant raises two claims on appeal. First, he contends that the trial court improperly allowed an officer to testify regarding a witness' identification of the defendant in a still photograph taken from video surveillance footage. Second, the defendant claims that the trial court improperly denied his motion for a new trial based on juror misconduct.

With respect to the defendant's first claim, the parties originally relied on *State* v. *Finan*, supra, 275 Conn. 60, in support of their respective positions. The defendant argued that, because the witness' identification constituted a lay opinion that embraced the ultimate issue to be decided by the trier of fact, the admission of the officer's testimony recounting that lay opinion violated § 7-3 (a) of the Connecticut Code of Evidence. The state responded that the officer's testimony recounted the witness' *factual* recognition of the defendant in the photograph, and, therefore, the testimony was not lay opinion testimony subject to § 7-3 (a) of the Connecticut Code of Evidence. Following oral argument, we ordered the parties to submit supplemental briefs addressing two issues: (1) "Whether this court should adopt [r]ule 704 (a) of the Federal Rules of Evidence[5] and overrule *State* v. *Finan*, [supra, 275 Conn. 60]?" (Footnote added.) And (2) "[i]f the court

adopts [r]ule 704 (a) of the Federal Rules of Evidence, what standard should govern the admission of lay opinion testimony identifying a defendant as depicted in photographic or video surveillance?"[6]

In his supplemental brief, the defendant urges the court to refrain from abandoning the ultimate issue rule and overruling *Finan*. The defendant contends that the rule change would be drastic, and that he would suffer unfair prejudice if the court applies the rule in the present case. The defendant argues that, if the court adopts rule 704 (a) of the Federal Rules of Evidence, the standard by which the admissibility of lay opinion testimony identifying a defendant in photographic or video surveillance should be crafted in a manner designed to protect, to the greatest extent possible, the jury's role as the fact finder.

As we explain subsequently in this opinion, our amendment of § 7-3 (a) to the Connecticut Code of Evidence to incorporate an exception for testimony relating to the identification of persons depicted in surveillance video or photographs does not affect the result in this appeal.[7] We affirm the judgment of the trial court.

The jury could have found the following relevant facts. At approximately 1 p.m. on January 20, 2017, the defendant shot and killed the victim, Jason Reddick, at a Sunoco gas station located at 550 Albany Avenue in Hartford. Video surveillance cameras at the gas station, as well as cameras located at nearby buildings on Albany Avenue and Garden Street, captured the shooting. The video footage showed the victim, wearing a turquoise hooded sweatshirt, walking toward one of the gas pumps at the station. The shooter, subsequently identified as the defendant, wore blue and white Nike sneakers and a Los Angeles Lakers cap. He entered the frame, pulled out a gun and fired once at the victim, hitting him in the torso. The victim retreated on foot northbound on Garden Street. The shooter followed the victim, first in his vehicle, then on foot. The shooter's vehicle was an older model, green, four door Volvo, with mismatched front and rear rims, a blue sticker attached to the windshield and a unique license plate holder.

Officers who reported to the scene discovered the victim's body in a parking lot at 520 Albany Avenue. They also discovered one spent .25 caliber shell casing near one of the gas pumps in the gas station lot and a trail of blood leading northbound on Garden Street. When the police later searched the defendant's vehicle, they found, under the driver's seat, an unfired, .25 caliber bullet, with the same casing as the one found at the gas station.

On the day following the shooting, the police located an older model, green Volvo in the driveway at 31 Winchester Street in Hartford, the home of Caron Canty. The Volvo had mismatched rims, a blue sticker on the

windshield and a license plate frame resembling the one depicted in the surveillance video. The license plates on the car were registered to a different vehicle, owned by Crystal Gore. Detectives spoke with Canty, who told them that the car belonged to the defendant. Canty accompanied the detectives to the major crimes division of the Hartford Police Department, where he gave a statement. Canty had never seen anyone other than the defendant drive the Volvo, and, as far as Canty knew, the defendant was the only person who had keys to the car. The defendant lived in Middletown and, when staying in Hartford, he sometimes left his car in Canty's driveway.

Canty described the defendant as a close friend, whom he had known for "half [his] life." He had seen the defendant, whom he referred to as his "cousin," on most days around the time of 2016 and 2017. He, in fact, had seen the defendant at approximately 5:30 p.m. on the day of the shooting. On that day, the defendant arrived at Canty's home in the Volvo, wearing what Canty described as a red "Nike outfit." The defendant, Canty, and the defendant's sister's boyfriend spent the evening in the south end of Hartford together. The next day, Canty and the defendant spent several hours together at Canty's house. The defendant departed before the police arrived, but he left his car in Canty's driveway.

At the station, the lead detective in the case, Jeffrey Placzek, showed Canty a photograph of the defendant that had been posted on the defendant's Facebook page in December, 2016, less than one month before the shooting. Canty identified the defendant in the photograph, then signed, dated, and wrote the defendant's nickname, "Tron," at the bottom of the photograph. In the photograph, the defendant wore a Lakers cap and blue and white sneakers. Placzek then showed Canty a 2015 booking photograph of the defendant. After identifying the defendant in the photograph, Canty signed, dated, and wrote "my cousin Tron" underneath the photograph.

Placzek next showed Canty a still photograph of the vehicle in the video surveillance footage. Canty identified the vehicle as the defendant's, then signed, dated, and indicated on the back of the photograph that it was the defendant's vehicle.[8] Finally, Placzek showed Canty a still photograph taken from the video surveillance footage. Canty identified the person depicted in the photograph as the defendant. He signed, dated, and wrote "Tron" on the back of the photograph.

Subsequently, during the defendant's trial, Placzek testified that Canty identified the subject depicted in the still photograph as the defendant. Following his conviction, the defendant appealed directly to this court.

I

We first address the defendant's claim that the trial court improperly allowed Placzek to testify that Canty had identified the defendant as the person depicted in the still photograph taken from the video surveillance footage. The parties' disagreement centers on whether the trial court properly concluded that Canty's identification was not a statement of opinion but, rather, a recounting of Canty's factual recognition of the defendant. The state posited that it was permissible factual testimony. The defendant countered that it was prohibited lay opinion. Until today, that distinction mattered.

As we explain in this opinion, the application of the ultimate issue rule, as set forth in § 7-3 (a) of the Connecticut Code of Evidence, to identifications of criminal defendants in video surveillance footage has spawned a line of cases that, rather than focusing on the relative helpfulness of the testimony to the trier of fact versus the potential prejudice to the defendant, have struggled to distinguish between fact and opinion testimony, and then, if the testimony is deemed opinion testimony, whether it embraces an ultimate issue. We now eschew those distinctions in favor of focusing on whether a witness' testimony would be helpful to the jury and not prejudicial to the defendant. We therefore conclude, albeit on different grounds, that the trial court properly admitted the testimony.

We emphasize that, even if we applied § 7-3 (a) of the Connecticut Code of Evidence without the amendment we announce today, we would conclude that the trial court acted within its discretion in admitting the testimony. We nonetheless ground our decision on the application of the rule change we announce today because doing so illustrates the application of the new rule. In addition, trial courts have struggled to apply § 7-3 (a) of the Connecticut Code of Evidence in this context, laboring both to draw an illusory distinction between fact and opinion testimony suggested by *Finan* and its progeny, and to determine when identifications of persons in video footage or still photographs embrace an ultimate issue.[9] Rather than apply an analysis that we have determined to be grounded on artificial and illusory distinctions, we believe that the better approach is to provide the trial courts with an illustration of the application of the totality of the circumstances test that we adopt today.

We begin with the following additional procedural background. The primary issue at trial was identification. At the start of trial, the defendant filed a motion in limine to preclude the state from introducing Canty's statement to the police identifying the defendant in the video and the still photograph. The defendant argued that the admission of Canty's statement would violate the prohibition in § 7-3 (a) of the Connecticut Code of Evidence against lay opinion testimony that embraces an ultimate issue to be decided by the trier of fact. In

support of his argument that such evidence would constitute a statement of opinion, the defendant contended that the facial features of the subject were not discernible in either the video or the still photograph. The state relied on Canty's familiarity with the defendant to argue that, even if the images of the individual in the video and the still photograph were not clear to persons unfamiliar with the defendant, they were discernible to Canty.

The court first determined that, because the video footage shown to Canty preceded the footage showing the actual shooting by only twenty seconds or so, Canty's identification of the defendant in the video embraced an ultimate issue in the case—the identification of the shooter. Because § 7-3 (a) of the Connecticut Code of Evidence applies only to opinion testimony, the remaining issue was whether Canty's identification was a matter of fact or opinion. To resolve that question, the trial court turned to this court's decision in *State* v. *Finan*, supra, 275 Conn. 60, and its progeny. Specifically, relying on the Appellate Court's refinement of *Finan* in *State* v. *Felder*, 99 Conn. App. 18, 25 n.6, 912 A.2d 1054, cert. denied, 281 Conn. 921, 918 A.2d 273 (2007), the trial court explained that, if there is a sufficient basis for recognition in the video or photograph, a witness' recognition of a subject based on their long-standing association is a statement of fact, not opinion.

Applying that principle from *Felder*, the trial court found that, in the video footage, the suspect was too far away to be recognized. Therefore, the court concluded, Canty's identification of the defendant in the video would constitute lay opinion testimony as to an ultimate issue to be decided by the trier of fact, in violation of § 7-3 (a) of the Connecticut Code of Evidence.

By contrast, the court found that the photograph allowed for recognition because it showed the defendant's face from fairly close up and still. Because Canty indicated in his written statement, however, that he had signed the back of the photograph "to confirm that this was Tron in the video," the court granted the motion in limine as to both the video and the photograph. The court reasoned that, because the person in the video was not recognizable, any testimony stating that the persons depicted in the photograph and the video were one and the same, which inherently required a comparison between the two, was a matter of opinion.

The court subsequently ruled that Placzek's testimony that Canty had told him that the subject in the still photograph was the defendant was admissible pursuant to § 8-5 (2) of the Connecticut Code of Evidence, which provides that the "identification of a person made by a declarant prior to trial where the identification is reliable" is not excluded from evidence by the hearsay rule, provided the declarant is available for cross-examination at trial. The court noted that Canty was available for cross-examination at trial. Although the court did

not expressly state that it found Canty's identification to be reliable, that finding may be inferred by the court's reference, in its ruling, to Canty's "long-standing association with [the defendant]." The court ruled that Placzek's testimony as proposed by the state could come in for the truth of the matter asserted pursuant to *State v. Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). Thereafter, at trial, Canty denied that he ever identified the defendant in the still photograph. Consistent with the court's ruling, Placzek testified that Canty had told him that the subject in the still photograph was the defendant.

In the context of lay witness identifications of a person in surveillance video or photographs, the prohibition against opinion testimony on an ultimate issue in § 7-3 (a) of the Connecticut Code of Evidence sometimes requires courts to draw tortuous distinctions in order to render the rule workable. The present case exemplifies the problem—in order to determine whether the identification of the defendant as the subject in the footage embraced an ultimate issue, the trial court found itself counting the seconds between the footage shown to the witness and the footage depicting the offense. It is debatable whether a longer time gap would always suffice to draw the distinction. In some cases, the nature of the video footage may make it impossible to identify the suspect as the defendant at any point in the footage without also finding that the defendant is depicted in the video as the person committing the crime. For instance, if a shooter's movements are depicted without pause in hours of footage, including during the actual shooting, the identification of the suspect as the defendant at the beginning of the video, hours before the offense is recorded, may very well embrace an ultimate issue.

Laborious calculations of the timing in video footage represent only one of the potential hurdles set by § 7-3 (a) of the Connecticut Code of Evidence. The *Finan* decision illustrates a more fundamental challenge created by the ultimate issue rule—distinguishing between testimony that "embraces an ultimate issue" and testimony that is simply material to the state's case. In *Finan*, four officers had identified the defendant as one of two men depicted in video surveillance footage of a convenience store clerk being robbed at gunpoint. *State v. Finan*, supra, 275 Conn. 61–62. The video footage depicted the two men entering the store, one armed and one unarmed. The unarmed man, whom the officers identified as the defendant, walked past the checkout area out of camera range. The armed man, who remained in camera range, aimed his gun at the store clerk. The armed man then exited the store; the unarmed man walked out simultaneously. Id., 62. Each officer testified as to how long he or she had known the defendant, ranging from eight to sixteen years, and also testified

as to what enabled him or her to identify the defendant as the unarmed man depicted in the video. Id., 63. The officers cited to details such as the defendant's profile, his mannerisms and his distinctive walk. Id.

In its analysis of the defendant's claim that the officers' testimony violated § 7-3 (a) of the Connecticut Code of Evidence, the Appellate Court concluded that the testimony did not embrace an ultimate issue to be decided by the trier of fact. *State* v. *Finan*, 82 Conn. App. 222, 232, 843 A.2d 630 (2004). The court reasoned that not "every fact that is material to guilt is, for that reason alone, an ultimate issue." Id. In order for an issue or fact to embrace the ultimate issue, it must be so interwoven with the question of guilt that it cannot reasonably be separated. Id., 231. Although the identification of the defendant as one of the men in the video was material to the state's case, that identification could be disentangled from the ultimate question of guilt. Id., 232. All that the video proved, the court explained, was that the defendant was in the store simultaneously with the robber—the state still needed to prove that the defendant had participated in the crime. Id. The court concluded, therefore, that the officers' testimony did not violate § 7-3 (a) of the Connecticut Code of Evidence. See id., 233.

In the appeal to this court, although we began with the same definition of "ultimate issue" as the Appellate Court, this court concluded that the identifications embraced an ultimate issue. *State* v. *Finan*, supra, 275 Conn. 66–67. This court's review of the record persuaded it that the identification of the defendant as the person shown in the video was central to the jury's determination of the defendant's guilt. Id., 67–69. Although this court's decision in *Finan* did not discuss whether there is a distinction between evidence that is material and evidence that embraces the ultimate issue, its analysis suggests that the court saw none.

In applying § 7-3 (a) of the Connecticut Code of Evidence, Connecticut courts have also struggled to distinguish between fact and opinion testimony. Although this court has not had occasion to consider the distinction, the Appellate Court has done so. See *State* v. *Holley*, 160 Conn. App. 578, 127 A.3d 221 (2015), rev'd on other grounds, 327 Conn. 576, 175 A.3d 514 (2018); *State* v. *Felder*, supra, 99 Conn. App. 18. Both the *Felder* and *Holley* decisions relied on the witness' level of familiarity with the defendant to distinguish between factual recognition and mere opinion.

In *Holley*, the defendant was convicted of numerous crimes, including felony murder, in connection with a home invasion. *State* v. *Holley*, supra, 160 Conn. App. 582. At trial, the state presented testimony from Nicole Clark, a coworker of the defendant, who identified him on video surveillance footage taken on a bus he rode home with his coconspirator after committing the crimes.

Id., 615. The Appellate Court concluded that Clark's testimony that she recognized the defendant's face in the still photographs from the footage "is not characterized accurately as *opinion* testimony as to whether the photograph depicted the defendant. Clark recognized the defendant's face as it appeared in the still image based on the fact of her past acquaintance with him; she did not merely offer an opinion as to whether the still image depicted the defendant. Thus, her testimony was based on the *fact* that she recognized the defendant, not on an opinion that the photograph depicted him." (Emphasis in original.) Id., 617.

In *Felder*, the defendant was convicted of robbery in the first degree and larceny in the third degree in connection with a bank robbery. *State* v. *Felder*, supra, 99 Conn. App. 19–20. At trial, his girlfriend and former roommate, Michelle Mills, testified that she recognized him in photographs taken from the bank surveillance video. Id., 21. Mills testified that her recognition of the defendant was based on his head covering, sneakers, nose and posture. Id. On appeal, the defendant relied on this court's decision in *Finan* to argue that Mills' testimony should have been excluded as lay opinion testimony that went to the ultimate issue. Id., 25 n.6. The Appellate Court rejected the defendant's claim on the ground that Mills' testimony did not constitute opinion testimony. Id. Although the court did not explain the reasoning that led it to that conclusion, in the facts section, the court specifically detailed Mills' level of familiarity with the defendant, listed the bases of her recognition, and stated that she testified that she "recognized" the defendant. Id., 21.

Both *Holley* and *Felder* envision a continuum. At one end, the testimony of witnesses with an intimate level of familiarity, such as a parent or sibling, concerns factual recognition, and such testimony is not subject to § 7-3 (a) of the Connecticut Code of Evidence. At the opposite end, witnesses who never met or saw the defendant prior to identifying him as depicted in video or still photographs would be prohibited by § 7-3 (a) of the Connecticut Code of Evidence from offering lay witness opinion testimony that embraces an ultimate issue. The *Felder/Holley* approach holds a certain familiar appeal. After all, as the trial court in the present case explained, it would be odd to question the ability of a parent to recognize his or her child in a photograph or video.

Our prior case law also offers insight into the particular nature of this type of identification evidence, namely, the process of recognizing a familiar face. In *Shields* v. *State*, 45 Conn. 266, 269 (1877), this court explained that "[a] witness well acquainted with another usually identifies him without conscious mental effort in the way of comparison or inference. In the absence of striking peculiarities of form or feature the identification may be, and often is, by the mere expression of countenance,

which cannot be described. And the witness may be correct in his opinion, and yet be unable to give a single feature, or the color of the hair, or of the eyes, or any particulars as to the dress. In such cases the distinction between opinion and fact is so very nice that it might perhaps have been as well to consider such identification as a fact, like any other direct perception of the senses." (Internal quotation marks omitted.)

To be sure, both the federal courts and legal scholars have characterized the distinction between fact and opinion as illusory. The United States District Court for the Eastern District of New York summarized the problem, observing that "Wigmore . . . questioned the possibility of clearly distinguishing the two: 'As soon as we come to analyze and define these terms . . . the distinction vanishes . . . .' [7 J. Wigmore, Evidence (Chadbourne Rev. 1978) § 1919]. Moore also acknowledged 'the illusory quality of such a fact-opinion distinction.' [11 J. Moore, Moore's Federal Practice (2d Ed. 1976) § 701.02]. The critical point bearing on the issue . . . is not simply the philosophical insight that statements usually contain both objective and subjective components . . . but rather the practical experience that opinions often represent a summary of statements of fact. The lay witness uses his opinion as a shorthand rendition of a set of collective facts otherwise difficult to state." (Citations omitted; internal quotation marks omitted.) *In re Franklin National Bank Securities Litigation*, 478 F. Supp. 577, 584 (E.D.N.Y. 1979); see also *Beech Aircraft Corp.* v. *Rainey*, 488 U.S. 153, 168, 109 S. Ct. 439, 102 L. Ed. 2d 445 (1988) (observing that "[i]t has frequently been remarked that the distinction between statements of fact and opinion is, at best, one of degree: All statements in language are statements of opinion, i.e., statements of mental processes or perceptions. So-called statements of fact are only more specific statements of opinion." (Internal quotation marks omitted.)); G. Bach, "Moderating the Use of Lay Opinion Identification Testimony Related to Surveillance Video," 47 Fla. St. U. L. Rev. 445, 451 (2020) ("[i]n its 'purest form,' lay opinion testimony is just a 'shorthand rendition' of the facts that a witness observed").

In short—at least in this narrow context—we have arrived at the same conclusion that prompted the advisory committee for the Federal Rules of Evidence to abolish the ultimate issue rule. See Fed. R. Evid. 704 (a), advisory committee notes. Specifically, the advisory committee notes to rule 704 (a) of the Federal Rules of Evidence state that "[t]he rule was unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information. [7 J. Wigmore, supra, §§ 1920 and 1921; C. McCormick, Evidence (1954) § 12]. The basis usually assigned for the rule, to prevent the witness from 'usurping the province of the jury,' is aptly characterized as 'empty rhetoric.' [7 J. Wigmore, supra, § 1920]. Efforts to meet the felt

needs of particular situations led to odd verbal circumlocutions which were said not to violate the rule."[10]

For all these reasons, we now hold that opinion testimony that relates to the identification of persons depicted in surveillance video or photographs is not inadmissible solely because it embraces an ultimate issue. Lay opinion testimony identifying a person in surveillance video or photographs is admissible if that testimony meets the requirements of § 7-1 of the Connecticut Code of Evidence.[11] That is, such testimony is admissible if the opinion is "rationally based on the perception of the witness and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue." Conn. Code Evid. § 7-1. To the extent that this court's decision in *Finan* is inconsistent with the rule we adopt today, that decision and its progeny; see *State* v. *Holley*, supra, 160 Conn. App. 578; *State* v. *Felder*, supra, 99 Conn. App. 18; are overruled.[12]

Because § 7-1 of the Connecticut Code of Evidence essentially mirrors rule 701 of the Federal Rules of Evidence,[13] we look to federal decisions for guidance in determining whether the trial court in the present case acted within its discretion in allowing the testimony. The Third Circuit explained the careful balancing intended to be effectuated by rule 701 of the Federal Rules of Evidence, which represents "a movement away from . . . courts' historically skeptical view of lay opinion evidence, and is rooted in the modern trend away from fine distinctions between fact and opinion and toward greater admissibility. . . . The [r]ule is nonetheless designed to exclude lay opinion testimony that amount[s] to little more than choosing up sides . . . or that merely tell[s] the jury what result to reach . . . ." (Citations omitted; internal quotation marks omitted.) *United States* v. *Stadtmauer*, 620 F.3d 238, 262 (3d Cir. 2010), quoting Fed. R. Evid. 704, advisory committee notes.

We begin with the observation that identifications of a defendant in surveillance video or photographs differ from eyewitness identifications. Unlike eyewitness identifications, which are grounded on the witness' recollection of what the witness observed during the incident in question, an identification of a defendant by a nonpercipient witness in surveillance video or photographs is grounded on the witness' general familiarity with the defendant's appearance or the witness' familiarity with the defendant's appearance at the time that the incident occurred.

An eyewitness, therefore, testifies regarding something that the jury cannot itself observe—that the eyewitness observed the defendant engaged in conduct that is relevant to whether he committed the offense with which he is charged. Jurors can never be on the same footing as an eyewitness because they were not there. In contrast, a witness who identifies the defen-

dant in surveillance video or photographs testifies regarding material that the jury also is able to observe. Unlike the past events testified to by an eyewitness, the video or photographs in evidence are physically present in the courtroom. So is the defendant. The jury is therefore able to compare the defendant with the video or photographs. Accordingly, as a general rule, nonpercipient lay opinion testimony identifying a defendant in surveillance video or photographs is admissible only "if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph [or video] than is the jury." *United States* v. *Farnsworth*, 729 F.2d 1158, 1160 (8th Cir. 1984).

In making this determination, courts evaluate the totality of the circumstances. See, e.g., *United States* v. *Beck*, 418 F.3d 1008, 1015 (9th Cir. 2005). Courts consider the following four factors relevant to determining whether the witness is more likely to correctly identify the defendant than is the jury: (1) the witness' general level of familiarity with the defendant's appearance; see, e.g., *United States* v. *Jackman*, 48 F.3d 1, 3–6 (1st Cir. 1995) (defendant's former wife and two acquaintances, each of whom had known defendant for years, had sufficient relevant familiarity with defendant to allow testimony identifying defendant in surveillance footage); (2) the witness' familiarity with the defendant's appearance, including items of clothing worn, at the time that the surveillance video or photographs were taken; see, e.g., *United States* v. *Saniti*, 604 F.2d 603, 605 (9th Cir.) (roommates allowed to identify defendant in surveillance footage based both on general familiarity with defendant and familiarity with defendant's clothing), cert. denied, 444 U.S. 969, 100 S. Ct. 461, 62 L. Ed. 2d 384 (1979); (3) a change in the defendant's appearance between the time the surveillance video or photographs were taken and trial, or the subject's use of a disguise in the surveillance footage; see, e.g., *United States* v. *Farnsworth*, supra, 729 F.2d 1160 (defendant wore scarf over his face at time of robbery and had grown full beard by time of trial); and (4) the quality of the video or photographs, as well as the extent to which the subject is depicted in the surveillance footage. See, e.g., *United States* v. *Allen*, 787 F.2d 933, 936 (4th Cir. 1986) ("less than clear" quality of photographs, which provided only "limited glimpses" of individual depicted, rendered testimony of witnesses familiar with defendant more helpful to jury), vacated on other grounds, 479 U.S. 1077, 107 S. Ct. 1271, 94 L. Ed. 2d 132 (1987).

A witness' general familiarity with the defendant is relevant both to whether the testimony is rationally based on the witness' perception and whether the testimony is helpful to the fact finder. The Fourth Circuit explained: "[T]estimony by those who knew defendants over a period of time and in a variety of circumstances offers to the jury a perspective it could not acquire

in its limited exposure to defendants. Human features develop in the mind's eye over time. These witnesses had interacted with defendants in a way the jury could not, and in natural settings that gave them a greater appreciation of defendants' normal appearance. Thus, their testimony provided the jury with the opinion of those whose exposure was not limited to three days in a sterile courtroom setting." Id.

Decisions of state and federal courts have set a low bar for general familiarity, holding that, as long as a witness has a greater degree of familiarity with the defendant than does the jury, the general familiarity requirement favors admissibility.[14] For example, courts have held this factor to support admissibility when law enforcement witnesses gained familiarity with the defendant by observing him from a distance. See, e.g., *United States* v. *Houston*, 813 F.3d 282, 287, 292 (6th Cir.) (trial court properly allowed video surveillance identification testimony of federal agent who had observed defendant in drive-bys of defendant's farm), cert. denied,    U.S.   , 137 S. Ct. 567, 196 L. Ed. 2d 448 (2016); id., 292 ("someone who is personally familiar with an individual is presumptively better able to identify the individual in a photograph than a juror"). Courts have concluded that witnesses who have had a handful of encounters of undetermined or brief duration with the defendant have nonetheless acquired sufficient general familiarity. See, e.g., *United States* v. *Arroyo*, 600 Fed. Appx. 11, 15 (2d Cir. 2015) (superintendent of apartment building who recognized defendant as boyfriend of one of building's tenants, and had seen defendant in building "several times," was properly allowed to identify defendant in video surveillance); *United States* v. *Kornegay*, 410 F.3d 89, 95 (1st Cir. 2005) (holding that detective's contact with defendant "on six occasions within a few months is within the zone that courts have found acceptable to show that the witness was sufficiently familiar with the defendant to provide a useful identification"); *United States* v. *Pierce*, 136 F.3d 770, 775 (11th Cir.) (identification testimony of probation officer who met defendant ten times over seven months was properly admitted because those contacts provided some basis for concluding that witness was "more likely" than jury to correctly identify defendant from photograph (internal quotation marks omitted)), cert. denied, 525 U.S. 974, 119 S. Ct. 430, 142 L. Ed. 2d 350 (1998); *United States* v. *Wright*, 904 F.2d 403, 404–405 (8th Cir. 1990) (court properly admitted identification testimony of police officer who had seen defendant eight to ten times over two to three years); *United States* v. *Allen*, supra, 787 F.2d 935 (familiarity requirement was met when parole officer briefly met defendant on six or seven occasions); *People* v. *Mixon*, 129 Cal. App. 3d 118, 129, 180 Cal. Rptr. 772 (1982) (police officer possessed sufficient relevant familiarity when he had never spoken with defendant but had seen him from relatively close

range on "numerous occasions" over period between one and ten years (internal quotation marks omitted)). Some courts have required even less, holding that a witness who viewed the defendant on a single occasion had sufficient general familiarity with the defendant. See, e.g., *United States* v. *Jackson*, 688 F.2d 1121, 1123–25 (7th Cir. 1982) (witness who met defendant only once, at holiday party, had sufficient general familiarity), cert. denied, 460 U.S. 1043, 103 S. Ct. 1441, 75 L. Ed. 2d 797 (1983); *Robinson* v. *People*, 927 P.2d 381, 382, 384 (Colo. 1996) (detective who had single, prior encounter with defendant had sufficient general familiarity); *People* v. *Thompson*, 49 N.E.3d 393, 408 (Ill. 2016) (witness who never met defendant, but saw him once, when he was sleeping on porch of mutual friend's house, had sufficient familiarity); see also annot., B. Filbert, "Admissibility of Lay Witness Interpretation of Surveillance Photograph or Videotape," 74 A.L.R.5th 643, 654–74, § 3 [a] (1999) (citing cases in which courts held that witness' familiarity with defendant's appearance was sufficient to render video or photographic surveillance identification testimony helpful to jury).

Even in jurisdictions expressing the standard for general familiarity in language that *suggests* a higher bar, courts routinely find that standard met when the witness possesses marginally greater familiarity with the defendant than does the jury. For example, in *United States* v. *LaPierre*, 998 F.2d 1460, 1465 (9th Cir. 1993), the Ninth Circuit identified two means by which a proponent could introduce this type of testimony—by establishing general familiarity with the defendant or by demonstrating changed appearance and familiarity with the defendant's appearance at the time of the incident.[15] The court stated that the general familiarity requirement is met when "the witness has had *substantial and sustained contact* with the person in the photograph." (Emphasis added.) Id.

In *LaPierre*, the court held that neither of those conditions was met. There was no evidence that the defendant's appearance had changed, and the witness, a police officer, "not only did not know [the defendant], he had never even seen him in person." Id. Despite the high standard for general familiarity described in *LaPierre*, the Ninth Circuit subsequently has applied the same low bar as that applied in other jurisdictions. See, e.g., *United States* v. *Beck*, supra, 418 F.3d 1015 (witness who had seen defendant four times in two month period for total of more than seventy minutes was sufficiently familiar).

In the handful of cases in which courts applying either rule 701 of the Federal Rules of Evidence or a state analogue to the rule have concluded that witnesses lacked sufficient general familiarity to favor admissibility, the witness had little or no familiarity with the defendant. See, e.g., *United States* v. *Fulton*, 837 F.3d 281, 299 (3d

Cir. 2016) (identification testimony was improper when detectives' sole familiarity with defendant was "very limited" and acquired only after defendant was under investigation), cert. denied,     U.S.    , 139 S. Ct. 214, 202 L. Ed. 145 (2018); *United States* v. *Jadlowe*, 628 F.3d 1, 24 (1st Cir. 2010) (testimony of federal agent identifying defendant in surveillance footage was improperly admitted when agent made identification by comparing defendant's image on screen with his driver's license photograph, which was in evidence), cert. denied, 563 U.S. 926, 131 S. Ct. 1833, 179 L. Ed. 2d 788 (2011); *United States* v. *LaPierre*, supra, 998 F.2d 1465 (testimony was inadmissible when witness did not know defendant, had never seen him in person, and based identification in surveillance footage on review of photographs of defendant and witnesses' description of him); *Commonwealth* v. *Vacher*, 469 Mass. 425, 442, 14 N.E.3d 264 (2014) (video surveillance identification testimony of detective was improperly admitted when record did not reveal that "detective possessed any special familiarity with the defendant that the jury lacked, or that the defendant's appearance had changed since the time the footage was taken, such that the jury needed assistance in identifying the individual depicted"); see also annot., 74 A.L.R.5th, supra, § 3 [b], pp. 674–78 (citing cases in which courts have held that witness' level of familiarity with defendant was insufficient to render testimony helpful to jury).

Courts have recognized that the concept of "familiarity" with another person is not an either/or dichotomy of "unfamiliar" versus "familiar." Universally, however, courts have held that the degree of familiarity goes to the weight rather than to the admissibility of the testimony. For instance, in *United States* v. *Jackson*, supra, 688 F.2d 1126, the Seventh Circuit concluded that a witness who had met the defendant only once, at a holiday party, was properly permitted to identify the defendant in a surveillance photograph. The court explained that, "[w]hile we recognize that there is a difference between identification testimony which is based [on] a [witness'] one social encounter with the defendant and identification testimony which is based [on] a [witness'] close and on-going relationship with the defendant, we do not believe that the difference . . . is determinative of the issue of admissibility of the evidence. The amount of time that the witness had to observe the defendant goes to the weight to be accorded to the testimony by the jury rather than to its admissibility." Id., 1125; see also *United States* v. *Beck*, supra, 418 F.3d 1012, 1015 (probation officer's four contacts with defendant, each for thirty minutes or less, was sufficient for admissibility of testimony identifying defendant in surveillance photograph, as degree of familiarity goes to weight rather than to admissibility); *Robinson* v. *People*, supra, 927 P.2d 384 (rejecting defendant's challenge to testimony of detective, who had seen defendant once, that defen-

dant was depicted in surveillance photograph, as degree of familiarity goes to weight rather than to admissibility). But see *United States* v. *Calhoun*, 544 F.2d 291, 294–96 (6th Cir. 1976) (it was abuse of discretion to admit parole officer's testimony identifying defendant in surveillance photograph because probative value was outweighed by prejudice to defendant on basis that cross-examination to test witness' level of familiarity with defendant would reveal that he was on parole).

In summary, our review of the relevant case law reveals that courts regularly find that this prong of the totality of the circumstances inquiry favors admissibility unless the witness has had virtually zero prior contacts with the defendant. The low bar for general familiarity renders this prong close to meaningless, a mere rubber stamp on the road to admissibility. Rather than inquiring whether a witness has some degree of "familiarity" with the defendant's appearance, the general familiarity prong, as applied in federal and state courts, merely asks whether the witness has ever, even once, seen the defendant prior to identifying him in surveillance video or photographs.

The low standard for general familiarity tends to favor the prosecution.[16] Although a defendant in some instances may seek to introduce testimony that he is not the person depicted in surveillance video or photographs; see, e.g., *United States* v. *Jackman*, supra, 48 F.3d 4 (defendant's brother testified that suspect depicted in surveillance photographs was not defendant); in the vast majority of cases, it is the state that seeks to introduce this type of testimony.

We conclude that the low threshold for general familiarity applied in virtually all jurisdictions that have considered the admissibility of lay witness identifications of a defendant in surveillance video or photographs does not afford sufficient protection to criminal defendants against good faith mistaken identifications. We believe that the better rule is to require, in order for the witness' general familiarity with the defendant's appearance to weigh in favor of admissibility, that the proponent of the testimony demonstrate that the witness possesses more than a minimal degree of familiarity with the defendant. We acknowledge that we are eschewing the bright line rule applied by other jurisdictions in favor of one that relies on trial courts to exercise their discretion to determine whether this factor supports admissibility. That determination will rest on the facts and circumstances of each case. For instance, although we are confident that viewing a defendant sleeping on a porch on a single occasion is insufficient to render a witness' testimony identifying the defendant in video surveillance footage reliable; contra *People* v. *Thompson*, supra, 49 N.E.3d 408; we cannot rule out the possibility that, under some circumstances, a single encounter will be sufficient to satisfy this factor. In

exercising their discretion to determine whether the proponent has satisfied this factor, courts should consider whether the witness' level of familiarity with the defendant is sufficient to render the identification reliable. In making that determination, courts should consider the particular, relevant circumstances, including, but not limited to, the frequency, number and duration of any individual prior contacts; the duration of the entire course of contacts and the length of time since the contacts; the relevant viewing conditions; and the nature of the relationship between the witness and the defendant, if any. Of course, under certain circumstances, an itemized review of some of these circumstances will not be required. For example, in the present case, in which the witness had known the defendant for half of his life, it would make little sense to question the relevant viewing conditions during his contacts with the defendant.

Our conclusion is guided in part by the measures taken, both by this court and by the legislature, to protect defendants against good faith, mistaken identifications in the related context of eyewitness identification. As we have observed in this opinion, eyewitness identifications are different from identifications of a defendant in surveillance footage. The two contexts, however, overlap in one significant respect: both involve the witness' claimed recognition of the defendant.

We have recognized that recent scientific developments "abundantly [demonstrate] the many vagaries of memory encoding, storage and retrieval; the malleability of memory; the contaminating effects of extrinsic information; the influence of police interview techniques and identification procedures; and the many other factors that bear on the reliability of eyewitness identifications." (Internal quotation marks omitted.) *State* v. *Guilbert*, 306 Conn. 218, 237, 49 A.2d 705 (2012). In light of the growing body of scientific research and studies revealing the fallibility of eyewitness identifications, this court has increased the procedural safeguards that apply in the context of eyewitness identifications. See, e.g., *State* v. *Harris*, 330 Conn. 91, 115, 191 A.3d 119 (2018) (state constitution required modification of factors set forth in *Neil* v. *Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), in light of "recent developments in social science and the law"); *State* v. *Guilbert*, supra, 234–35 (relying on "near perfect scientific consensus" in reversing longstanding bar on admission of expert testimony on fallibility of eyewitness identification); *State* v. *Ledbetter*, 275 Conn. 534, 578–79, 881 A.2d 290 (2005) (relying on growing body of scientific research in invoking supervisory authority to require trial courts to instruct jury of risk of misidentification in cases in which law enforcement failed to instruct witness that perpetrator may or may not be present in identification procedure, unless no significant risk of misidentification exists) (over-

ruled in part on other grounds by *State* v. *Harris*, 330 Conn. 91, 191 A.3d 119 (2018)), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

The General Assembly has also enacted legislation adding significant procedural protections in the context of eyewitness identifications. See General Statutes § 54-1p. In adding the procedural safeguards, the legislature, like this court, relied on scientific research. See, e.g., 54 H.R. Proc., Pt. 23, 2011 Sess., p. 7813, remarks of Representative Gary Holder-Winfield (stating that new procedural safeguards intended to incorporate "the latest scientific [research] and best procedures"). None of the procedural safeguards in § 54-1p is currently required for witnesses who identify a defendant in surveillance video or photographs.[17] In light of our restriction of this type of testimony to witnesses who possess more than a minimal degree of familiarity with the defendant, we deem it unnecessary at this time to require any additional procedural protections in this context. Requiring more than a minimal degree of familiarity in order for this prong to weigh in favor of admissibility significantly reduces the risk of mistaken identifications.

In comparison to the vast amount of scientific research on stranger identifications, there have been only a small number of studies focused on the accuracy of familiar identifications. See J. Vallano et al., "Familiar Eyewitness Identifications: The Current State of Affairs," 25 Psychol. Pub. Policy & L. 128, 128–29 (2019) (observing that bulk of scientific studies of accuracy of eyewitness identifications have focused on stranger identifications, whereas "familiar identifications" have received only "sporadic and haphazard attention among social scientists and legal practitioners"). The relevant field studies in the area, however, are "remarkably consistent" and demonstrate that, as a general rule, familiarity renders an identification significantly more reliable than stranger identifications. Id., 131; see also *State* v. *Guilbert*, supra, 306 Conn. 259–60 (recognizing, in context of eyewitness identifications, that, "although there are exceptions, identification of a person who is [well-known] to the eyewitness generally does not give rise to the same risk of misidentification as does the identification of a person who is not [well-known] to the eyewitness"). The more problematic question is *how much* familiarity is required to render an identification of a defendant in surveillance video or photographs sufficiently reliable to allay concerns regarding a lack of available procedural protections against a mistaken identification.

As we have already stated, the concept of familiarity encompasses a broad range of possibilities. Unlimited, the term may include both a person's spouse of fifty years and a stranger's onetime brief encounter. Few would doubt the ability of a spouse to accurately iden-

tify his or her partner—even from the relatively poor quality that is common among surveillance video and photographs—but we do not have the same confidence in an identification by a person who has a minimal degree of familiarity with a defendant.[18]

We particularly note that, although familiarity increases the accuracy of identifications, these identifications are not immune from detracting factors such as expectations (the belief that one will come across a familiar face), the presence of a disguise, cross-racial identifications, and an increased distance between the witness and the target individual. J. Vallano et al., supra, 25 Psychol. Pub. Policy & L. 133. Requiring more than a minimal degree of familiarity provides greater assurance that a witness' identification of a defendant in surveillance footage will be less affected by these detractors. See V. Bruce et al., "Matching Identities of Familiar and Unfamiliar Faces Caught on CCTV Images," 7 J. Experimental Psychol.: Applied 207, 212 (2001) (demonstrating high level of accuracy in high degree familiarity identifications despite poor video quality). Indeed, in a given case, the presence of such detractors may prompt the trial court to exercise its discretion to allow expert testimony on the risks of misidentification pursuant to this court's decision in *State* v. *Guilbert*, supra, 306 Conn. 246–48. In addition, the trial court may provide a cautionary jury instruction. See, e.g., *State* v. *Harris*, supra, 330 Conn. 134–35 ("it may be appropriate for the trial court to craft jury instructions to assist the jury in its consideration of [the reliability of eyewitness testimony]").

In accordance with these principles, we decline to join the majority of jurisdictions that adhere to a minimum threshold for general familiarity and hold that the degree of a witness' familiarity with a defendant goes to the admissibility of the witness' identification of the defendant in surveillance video or photographs. In order for the witness' general familiarity with the defendant's appearance to weigh in favor of admitting such testimony, the proponent of the testimony must demonstrate that the witness possesses more than a minimal degree of familiarity with the defendant. Some illustrative examples of persons who may satisfy this standard are friends, longtime acquaintances, neighbors, coworkers, family members, and former classmates.

We believe that this standard comports with the requirement of § 7-1 of the Connecticut Code of Evidence that lay witness opinion testimony must be rationally based on the perception of the witness and helpful. When a witness who is familiar with the defendant's appearance views surveillance video or photographs that may or may not depict him, that witness brings to the task of identification an ability the jury cannot acquire in the context of a criminal trial. The witness' process of recognition is informed by having observed

the defendant in different contexts, over an extended period of time. That wealth of experience renders the testimony helpful to the jury. See *United States* v. *Allen*, supra, 787 F.2d 936 (contrasting perspective of jury with witness who had observed defendant in variety of circumstances over extended period of time).

The remaining three factors—the witness' familiarity with the defendant's appearance at the time of the surveillance footage, any change in the defendant's appearance since the surveillance or any disguise worn by the subject at the time of the surveillance, and the quality of the video or photographs—also should be considered under the totality of the circumstances along with the witness' general familiarity with the defendant. With respect to the quality of the video or photographs, we agree with the First Circuit that this factor favors admissibility when "the [video or] photographs are not either so unmistakably clear or so hopelessly obscure that the witness is no [better suited] than the jury to make the identification." *United States* v. *Jackman*, supra, 48 F.3d 5.

Applying these principles to the present case, we conclude that Canty's long-standing and intimate association with the defendant easily meets the general familiarity prong, which favors admitting Placzek's testimony that Canty had identified the suspect in the photograph as the defendant. Canty and the defendant had known each other for years. As Canty himself stated, he had known the defendant for half his life. They were so close that Canty described the defendant as his cousin.

The second prong, the witness' familiarity with the defendant's appearance at the time that the surveillance footage was recorded, also weighs in favor of admissibility. Canty was familiar with the defendant's appearance when the surveillance video was recorded. Indeed, he spent several hours with the defendant both on the day of the shooting and the following day. In addition, at the time of the shooting, Canty saw the defendant regularly—he spent time with the defendant on most days. He was familiar with the type of clothing the defendant wore, describing him as favoring Nike outfits.

As for the remaining two prongs, the record does not reflect whether the defendant's appearance changed between the time the surveillance video was recorded and the time of trial, and, although he wore a baseball cap in the surveillance footage, he was not wearing a disguise.[19] The quality of the photograph, however, also weighs in favor of admission. The trial court found that, although it was not unmistakably clear, the subject was close enough to the camera, and his face was visible enough, to allow for recognition. The trial court, therefore, properly admitted Placzek's testimony that Canty had identified the subject in the photograph as the defendant.

## II

We next address the defendant's claim that the trial court improperly denied his motion for a mistrial and a new trial based on alleged juror misconduct. Specifically, the defendant claims that the trial court abused its discretion in denying the defendant's motion for a new trial, in which he argued that he suffered prejudice when jurors brought in and used two unauthorized magnifying glasses to assist them in reviewing the photographic evidence during their deliberations. The state responds that the trial court acted within its discretion in concluding that the defendant had failed to prove that he suffered prejudice due to the alleged misconduct. We agree with the state.

The record reveals the following additional facts relevant to the resolution of this claim. In its final charge to the jurors, the court instructed them that they were not allowed to "go outside the evidence introduced in court to find the facts." On the first day of deliberations, the jury sent the court a note requesting a magnifying glass. Over defense counsel's objection, the court marked and sent to the jury a magnifying glass supplied by the state.[20] The jury sent a second note, requesting a "better" magnifying glass—the court denied that request.

After the verdict was announced, the trial judge met with the jurors "to talk to [them] informally about the trial process." During that discussion, after the jurors had returned the magnifying glass that the court had provided to them, the judge observed one of the jurors remove a different magnifying glass from her backpack, then replace it. The court subsequently held a hearing, pursuant to *State* v. *Brown*, 235 Conn. 502, 668 A.2d 1288 (1995), during which the court questioned both the foreman and the female juror who had displayed the magnifying glass. The female juror confirmed that she had brought in a magnifying glass, a toy belonging to her preschool aged son. She told the court that, although she did not use that magnifying glass, she believed that at least two other jurors did.

She informed the court that the foreman had also brought in a magnifying glass. She saw the foreman use the magnifying glass that he had brought but did not see anyone else use it. When the court pressed for more information regarding how the jurors had used the extra magnifying glasses, she explained that the jurors wished to use the magnifying glasses to assist them in evaluating the photographs that were not very clear, particularly the still photograph of the suspect taken from the video surveillance footage.

When the court questioned the foreman, he confirmed that he had brought a magnifying glass into court during deliberations. He told the court that the glass is called a "loupe," and it is used in photography for viewing negatives. The glass was old and foggy, no better

than reading glasses. He used the magnifying glass to view the still photograph of the suspect. He believed that one or two jurors seated near him also viewed the photograph through the magnifying glass.

Over the course of an additional two days, the court questioned the remaining jurors. Two of the jurors were questioned by telephone set to speaker mode in the courtroom. Most recalled seeing at least one of the additional magnifying glasses; many recalled both. Most of them remembered seeing at least some jurors using one of the additional magnifying glasses. The consensus was that people were using the magnifying glasses to view the photographs, particularly the still photographs from the video surveillance footage.

In its memorandum of decision denying the defendant's motion for a mistrial and a new trial, the trial court found that neither of the additional magnifying glasses, both of which had been marked as exhibits for the purpose of the hearing, had high powers of magnification. As to the loupe, the court found that it was quite foggy. The court also found that the additional two magnifying glasses did not allow the jury to do anything different or additional beyond what the court provided magnifier allowed.

Moreover, the court observed that "[t]he additional magnifiers did not introduce new evidence or alter existing evidence. Like the magnifying glass that the court authorized, the additional magnifying glasses simply allowed the jury to look closer at existing evidence, which was part of their task as jurors." The magnifying glasses, the court added, were "essentially neutral." The closer look allowed by a magnifier equally could have benefitted the defendant or the state and, therefore, was not inherently prejudicial to the defendant.

We review a trial court's determination as to whether juror misconduct has prejudiced a party for abuse of discretion. See, e.g., *State* v. *Roman*, 262 Conn. 718, 727, 817 A.2d 100 (2003). "We recognize that the trial judge has a superior opportunity to assess the proceedings over which he or she personally has presided . . . and thus is in a superior position to evaluate the credibility of allegations of jury misconduct, whatever their source." (Citations omitted.) *State* v. *Brown*, supra, 235 Conn. 527–28. For both forms of relief requested by the defendant, a mistrial and a new trial, he bore the burden of establishing that the alleged misconduct prejudiced him. See Practice Book § 42-43 (in motion for mistrial, defendant must show that alleged error resulted in "substantial and irreparable prejudice to the defendant's case"); Practice Book § 42-53 (in motion for new trial, defendant must show that error was "materially injurious" to him). In light of the trial court's findings that the two unauthorized magnifiers did not allow the jurors to do anything different or additional beyond what the court provided magnifier allowed and did not introduce

new evidence or alter existing evidence, we conclude that the court acted within its discretion in finding that the defendant had failed to prove that he was prejudiced by the alleged misconduct.

The judgment is affirmed.

In this opinion the other justices concurred.

* February 7, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Section 7-3 of the Connecticut Code of Evidence provides: "(a) General rule. Testimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that, other than as provided in subsection (b), an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue.

"(b) Mental state or condition of defendant in a criminal case. 'No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto, except that such expert witness may state his diagnosis of the mental state or condition of the defendant. The ultimate issue as to whether the defendant was criminally responsible for the crime charged is a matter for the trier of fact alone.' General Statutes § 54-86i."

[2] Although we use the terms "surveillance video" and "surveillance footage" in this opinion, our reasoning applies with equal force to identifications of a defendant in other types of video recordings and photographs that depict an event relevant to the case. For example, the rule we announce today would apply to any identifications of a defendant in cell phone videos or photographs.

[3] We emphasize that the rule change we announce today extends to identifications of any "person" depicted in surveillance video or photographic footage. Because the current appeal involves a criminal defendant, however, for ease of discussion, we sometimes refer to "defendants" depicted in surveillance video or photographic footage. Those references are not intended to narrow the scope of the exception we announce today to the ultimate issue rule.

[4] The trial court found the defendant guilty of criminal possession of a firearm in violation of § 53a-217 (a) (1).

[5] Rule 704 (a) of the Federal Rules of Evidence provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue."

[6] Subsequent to the issuance of the supplemental briefing order, we granted the application of the Connecticut Criminal Defense Lawyers Association for permission to submit an amicus brief.

[7] The defendant urges the court not to make the rule change in this appeal, contending that we should not raise the issue sua sponte. We disagree. This appeal presents appropriate circumstances for this court to raise the question sua sponte. The record is adequate for review, all parties have been afforded the opportunity to be heard, and, because our application of the amendment to § 7-3 (a) of the Connecticut Code of Evidence does not affect the result of the appeal, the defendant will not suffer prejudice. See, e.g., *In re Yasiel R.*, 317 Conn. 773, 790, 120 A.3d 1188 (2015); *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 155–61, 84 A.3d 840 (2014).

We emphasize that our narrow holding today is limited to the context of identifications of persons depicted in surveillance video or photographs. We do not address in this appeal whether we should abandon the ultimate issue rule in its entirety.

[8] Placzek also showed Canty an excerpt from the video itself, and Canty identified the suspect in the video as the defendant. The jury did not hear any evidence that Canty had identified the defendant in the video, however, because the trial court granted the defendant's motion in limine seeking to preclude that identification.

[9] In the present case, for example, during the hearing on the defendant's motion in limine, the trial court posed one hypothetical after another to counsel, trying to navigate the distinction between identifications that constitute factual recognition and ones that are opinion testimony.

We also take judicial notice of the transcripts in *State* v. *Bruny*, 342 Conn. 169, A.3d (2022), which we also decide today. See *Karp* v. *Urban Redevelopment Commission*, 162 Conn. 525, 527, 294 A.2d 633 (1972)

("[t]here is no question . . . concerning our power to take judicial notice of files of the Superior Court, whether the file is from the case at bar or otherwise"). In *Bruny*, which also involves lay witnesses who identified the defendant in surveillance footage, the trial court spoke more directly about the difficulties of applying *Finan*. Specifically, the court commented on the artificial distinction it was required to draw between video footage that shows the offense being committed and footage that does not, in order to determine whether the identification embraced an ultimate issue. The court further remarked on the uncertainty regarding whether the ultimate issue rule controlled when a witness was familiar with the defendant, thus highlighting the difficulty of the fact/opinion distinction.

[10] The vast majority of states also have enacted evidentiary codes abolishing the ultimate issue rule. See Alaska R. Evid. 704; Ariz. R. Evid. 704 (a); Ark. R. Evid. 704; Cal. Evid. Code § 805 (Deering 2004); Colo. R. Evid. 704; Del. R. Evid. 704; Fla. Stat. Ann. § 90.703 (West 2011); Ga. Code Ann. § 24-7-704 (a) (2013); Haw. R. Evid. 704; Idaho R. Evid. 704; Ill. R. Evid. 704; Ind. R. Evid. 704 (a); Iowa R. Evid. 5.704; Kan. Stat. Ann. § 60-456 (d) (Cum. Supp. 2020); La. Code Evid. Ann., art. 704 (2017); Me. R. Evid. 704; Md. R. Evid. 5-704 (a); Mich. R. Evid. 704; Minn. R. Evid. 704; Miss. R. Evid. 704; Mont. R. Evid. 704; Neb. Rev. Stat. § 27-704 (2016); Nev. Rev. Stat. § 50.295 (2019); N.H. R. Evid. 704; N.J. R. Evid. 704; N.M. R. Evid. 11-704; N.C. R. Evid. 704; N.D. R. Evid. 704; Ohio R. Evid. 704; Okla. Stat. Ann. tit. 12, § 2704 (West 2020); Or. Rev. Stat. § 40.420 (2017); Pa. R. Evid. 704; R.I. R. Evid. 704; S.C. R. Evid. 704; S.D. Codified Laws § 19-19-704 (2016); Tenn. R. Evid. 704; Tex. R. Evid. 704; Utah R. Evid. 704 (a); Vt. R. Evid. 704; Wn. R. Evid. 704; W. Va. R. Evid. 704; Wis. Stat. Ann. § 907.04 (West 2000); Wyo. R. Evid. 704; see also Supreme Judicial Court Advisory Committee on Massachusetts Evidence Law, Massachusetts Guide to Evidence (2021) § 704, p. 177 (summarizing Massachusetts law).

Virginia's evidentiary rule prohibits "opinion testimony on the ultimate issues of fact" in criminal proceedings, but not in civil cases. Va. R. Evid. 2:704. A lay witness who is familiar with the defendant and identifies him in surveillance footage does not, however, testify as to an ultimate fact. Under Virginia law, "[u]ltimate issues of fact for purposes of the conviction of a crime are the statutory elements of [the] offense." (Internal quotation marks omitted.) *Bowman* v. *Commonwealth*, 30 Va. App. 298, 303, 516 S.E.2d 705 (1999); see id. (testimony of defendant's father-in-law identifying defendant in video surveillance footage did not implicate "ultimate issue of fact" (internal quotation marks omitted)).

Alabama is the only state other than Connecticut that has, through its evidence code, expressly and categorically barred opinion testimony as to an ultimate issue. See Ala. R. Evid. 704 ("[t]estimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue to be decided by the trier of fact"). The Supreme Court of Alabama, however, has long held that testimony identifying a defendant as depicted in a surveillance video or photograph by a witness who has general familiarity with the defendant is not opinion evidence; rather, the witness is "testifying to facts that are within his personal knowledge." *Ex parte Rieber*, 663 So. 2d 999, 1011 (Ala.), cert. denied, 516 U.S. 995, 116 S. Ct. 531, 133 L. Ed. 2d 437 (1995).

Kentucky's evidence code does not expressly address the ultimate issue rule. The decision of the Supreme Court of Kentucky in *Stringer* v. *Commonwealth*, 956 S.W.2d 883 (Ky. 1997), cert. denied, 523 U.S. 1052, 118 S. Ct. 1374, 140 L. Ed. 2d 522 (1998), however, resolved the issue. In *Stringer*, the court recognized that its decisions in this area had been inconsistent. Id., 890–91. The court overruled the decisions that were inconsistent with rule 704 (a) of the Federal Rules of Evidence and clarified that "[w]e now once again depart from the 'ultimate issue' rule and rejoin the majority view on this issue." Id., 891.

Missouri's evidence code also does not expressly abandon the ultimate issue rule as to lay opinion testimony. Recent authority, however, follows the majority rule that such testimony is not necessarily barred. See *State* v. *Saucy*, 164 S.W.3d 523, 530 (Mo. App. 2005) (witness properly allowed to identify defendant in surveillance video; because she lived with defendant at time of crime and defendant's appearance had since changed, and, therefore, witness more likely than jury to correctly identify defendant in videotape).

New York has no code of evidence. The New York Court of Appeals, however, has upheld a trial court's decision to allow lay witness opinion testimony identifying a defendant in surveillance photographs. *People* v.

*Russell*, 79 N.Y.2d 1024, 1025, 594 N.E.2d 922, 584 N.Y.S.2d 428 (1992).

[11] In this appeal, we address the effect of the rule change we announce today on the admissibility of lay opinions identifying a person in video or photographic surveillance footage. In *State* v. *Bruny*, 342 Conn. 169, A.3d ___ (2022), also decided today, we address the effect of the rule change on the admissibility of expert opinions in the same context.

[12] Notwithstanding the codification of the common law in the Code of Evidence, this court retains the authority to "develop and change the rules of evidence through case-by-case common-law adjudication." *State* v. *DeJesus*, 288 Conn. 418, 421, 953 A.2d 45 (2008). Subsequent to the publication of this court's opinion in *DeJesus*, the legislature authorized this court to adopt the Connecticut Code of Evidence and expressly stated: "Nothing in this section shall limit with respect to the law of evidence the authority of the Supreme Court under common law . . . ." General Statutes § 51-14a (c). This court's subsequent notice of adoption emphasized our continuing authority over the code, noting that, "[i]n adopting the Code of Evidence, the Supreme Court expressly reserved to itself its common-law authority regarding the law of evidence." 76 Conn. L.J., No. 4, p. 1D (July 22, 2014); see also E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) §§ 1.1.4 through 1.1.7, pp. 10–16.

[13] Rule 701 of the Federal Rules of Evidence provides: "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

"(a) rationally based on the [witness'] perception;

"(b) helpful to clearly understanding the [witness'] testimony or to determining a fact in issue; and

"(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

[14] Notably, even Alabama, the only other state besides Connecticut that expressly retains the ultimate issue rule in its code of evidence; see footnote 10 of this opinion; has held that a lay witness may testify regarding the identity of a defendant in surveillance video or photographs if the witness "is better qualified or in a better position than the jury to draw the conclusion of identity from those facts personally observed by or known to [the witness]." *Hardy* v. *State*, 804 So. 2d 247, 269 (Ala. Crim. App. 1999), cert. denied, 534 U.S. 1043, 122 S. Ct. 621, 151 L. Ed. 2d 543 (2001); see also *Ex parte Rieber*, 663 So. 2d 999, 1011–12 (Ala.), cert. denied, 516 U.S. 995, 116 S. Ct. 531, 133 L. Ed. 2d 437 (1995).

If we were to retain the applicability of the ultimate issue bar to identifications of persons depicted in surveillance video or photographs, we would find the reasoning of *Ex parte Rieber*, supra, 663 So. 2d 999, and *Hardy* v. *State*, supra, 804 So. 2d 247, persuasive to the extent that it is consistent with the Appellate Court decisions in *State* v. *Felder*, supra, 99 Conn. App. 18, and *State* v. *Holley*, supra, 160 Conn. App. 578. Specifically, Alabama courts treat the testimony of a witness who identifies a defendant as depicted in surveillance video or photographs—and who has sufficient general familiarity with a defendant—as fact, rather than opinion testimony. *Ex parte Rieber*, supra, 1011. Such testimony, therefore, is not categorically barred by the ultimate issue rule. To determine whether testimony identifying a defendant in surveillance video or photographs is admissible, Alabama courts evaluate the totality of the circumstances in the same manner as the state and federal decisions on which we rely in this case. See *Hardy* v. *State*, supra, 804 So. 2d 270–71 (quoting *United States* v. *Pierce*, supra, 136 F.3d 774–75, for the applicable standard).

Thus, even without the rule change we announce today, we would have applied similar reasoning to that relied on by the Alabama courts, as well as *Felder* and *Holley*. Given Canty's familiarity with the defendant, both generally and at the time that the surveillance footage was recorded, those principles would have led us to the same conclusion that we arrive at today, namely, that Canty's identification of the defendant in the surveillance footage, as testified to by Detective Placzek, was admissible.

[15] The Ninth Circuit subsequently adopted the totality of the circumstances approach followed by the majority of jurisdictions. See *United States* v. *Beck*, supra, 418 F.3d 1015.

[16] The disadvantage that criminal defendants suffer due to the majority rule favoring admissibility unless the witness has no familiarity with the defendant is most pronounced when the witness is a member of law enforcement. See generally G. Bach, supra, 47 Fla. St. U. L. Rev. 445 (highlighting problems presented by law enforcement testimony in particular). Courts have recognized the risk that "testimony from law enforcement or corrections personnel may increase the possibility of prejudice to the defendant

either by highlighting the defendant's prior contact with the criminal justice system, if the [witness'] occupation is revealed to the jury, or by effectively constraining defense counsel's ability to undermine the basis for the [witness'] identification on cross-examination . . . ." *United States* v. *Pierce*, supra, 136 F.3d 776; see also *United States* v. *Calhoun*, supra, 544 F.2d 294–96.

Because the present case does not involve direct lay opinion testimony from a member of law enforcement, we need not determine whether to adopt any additional limitations on the use of such testimony. Some safeguards that may merit future consideration include (1) restricting the use of lay opinion testimony by members of law enforcement to instances "when no other adequate identification testimony is available to the prosecution"; *United States* v. *Farnsworth*, supra, 729 F.2d 1161; see also *United States* v. *Butcher*, 557 F.2d 666, 670 (9th Cir. 1977); (2) barring testimony concerning the nature of the relationship between the defendant and the law enforcement witness; see G. Bach, supra, 47 Fla. St. U. L. Rev. 475–76; (3) allowing the defendant an opportunity to examine the proffered witness outside the presence of the jury, thus affording the trial court the opportunity to rule on admissibility without risking prejudice to the defendant; see *People* v. *Thompson*, supra, 49 N.E.3d 407; (4) limiting the number of law enforcement witnesses who may offer such testimony; see G. Bach, supra, 476–77; and (5) requiring that the witness have gained familiarity with the defendant prior to the litigation. Id., 478.

[17] Indeed, some of those protections would not be applicable or appropriate in this context. For instance, the prohibition against visible writings or information concerning any previous arrest of the person suspected as the perpetrator simply does not apply in this context. See General Statutes § 54-1p (c) (8). Another example: we question whether a requirement that lineups be presented sequentially would be appropriate in this context.

[18] One study found the effects of a high degree of familiarity to have a significant impact on the accuracy of identifications from low quality closed-circuit television footage. See generally V. Bruce et al., "Matching Identities of Familiar and Unfamiliar Faces Caught on CCTV Images," 7 J. Experimental Psychol.: Applied 207 (2001). One of the experiments in the study involved two sets of participants. The first group had a high level of familiarity with the target face in the video. The second group was unfamiliar with any people in the experiment. Id., 208. Both groups were asked to determine whether a photograph matched the target person shown in poor quality video images. Id. The participants with a high degree of familiarity were able to match or reject matches with more than 90 percent accuracy, despite the poor quality of the video images. Id., 212. By comparison, the participants with no familiarity were able to accurately match or reject a match approximately 75 percent of the time. Id.

[19] Because we examine the totality of the circumstances in determining whether the identification testimony was admissible, the failure to satisfy this single factor to support admitting the testimony is not fatal. That weakness may be highlighted during cross-examination and in closing argument. See, e.g., *United States* v. *Jackman*, supra, 48 F.3d 5 (witnesses' lack of familiarity with defendant's appearance at precise time of robbery did not render testimony inadmissible).

[20] This court has held that it is within the discretion of the trial court to allow a jury to use a magnifying glass to inspect photographic evidence during deliberations. *State* v. *Wallace*, 78 Conn. 677, 678–79, 63 A. 448 (1906).